Commonwealth *v.* Doughty, Appellant.

Argued June 9, 1958. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ.

Before Dannehower, P. J.

*Bernard V. DiGiacomo,* for appellant.

*A. Benjamin Scirica,* for appellee.

Opinion by Watkins, J., September 11, 1958:

This is an appeal from the order of the Court of Quarter Sessions of Montgomery County, dismissing exceptions to a support order imposed upon the appellant husband, Stewart E. Doughty, requiring him to pay the sum of $40 per week for the support of his minor son, Ross, age 11, and $20 per week for the support of his wife Ann, a total of $60 weekly. The amount of the said order to be effective so long as the wife and son occupy the property held by the entireties and the appellant continue to pay the carrying charges on said real estate.

The appellant claims that the court below erred in entering any order; and that the order made was excessive and so vague as to prohibit compliance therewith.

The parties were married under fictitious names, in Elkton, Maryland, October 9, 1935. The wife at that time was 18 years of age, the husband nine months older. This marriage was kept secret and on December 14, 1941 they went through another marriage ceremony under their correct names and thereafter lived

together as man and wife. There is one child of the marriage, a son Ross, who was eleven years old at the time of this action.

It was apparently a happy marriage and they lived together without untoward incident in a home owned by the entireties in Creamery, Montgomery County, Pennsylvania. In June of 1956 the husband advised his wife that he had been having an affair with another woman for the past six or seven years and that she was pregnant. However, he promised not to see her again, so his wife forgave him and they continued to live together.

On November 17, 1956 the appellant put into operation a plan to get rid of his marriage obligation, more devious and complicated than has ever come to our attention. While the parties were on a shopping trip, he took his wife to the office of his attorney. She was there confronted with a prepared separation agreement and also a power of attorney containing a waiver of summons, entry of appearance and submission to the jurisdiction of a Mexican District Court, for the purpose of enabling the appellant to secure a Mexican divorce. The power of attorney contained unfilled blanks, including the agent's name and was in the past tense, setting forth that a divorce had already been begun when in fact, it had not at that time been instituted.

The appellant gave as his reason for this sudden drastic action that he was being threatened with arrest by the other woman; that he would be disgraced, lose his position and be forced to sell the stock in his father's corporation; and that the pregnant woman's three brothers were "gunning" for him unless these arrangements were completed. He further persuaded her to sign, by promising that the divorce and his marriage to the other woman was only for the purpose

of giving the expected child a name and that he would immediately divorce the other woman and remarry her.

Under these circumstances and without legal counsel and being advised to tell no one of the arrangements, she signed the papers. She was understandably "numb and nervous" at the time and did not fully understand the provisions of the documents.

The same evening the appellant flew to El Paso, Texas and the day following telephoned his wife that he was coming home and could not go through with it. He returned and continued to live with his wife.

On November 25, 1956, he again flew to El Paso, Texas. On this visit he remained three days. He merely crossed the bridge to Juarez to appear in court. He did not stay in Mexico even for one night, never lived there and had no intention to live there. He again returned to his home and wife on November 28, 1956. The Mexican divorce is dated November 28, 1956 and it was marked filed November 26, 1956.

Notwithstanding the separation agreement and the Mexican divorce they continued to live together without any change in their relationship. They made family plans for Christmas; celebrated their wedding anniversary; went out to dinner parties together with friends and never disclosed the incidents of the separation agreement and divorce.

On May 17, 1957 without any warning or notice, the appellant left their home, leaving a note in which he disclosed that he had married the other woman in December and that a child was born on December 18. He asked her to take it easy on his reputation as he now had five people to support. He indicated he expected the terms of the separation agreement to be carried out. He ended his note with the endearing words, "Will die loving you". He established a home in Norristown for the other woman and her child

where he is presently living. On June 12, 1957 the wife brought this action.

None of the provisions of the separation agreement were performed by the appellant from the date of the execution of the agreement on November 17, 1956 to the date of his leaving on May 6, 1957. To this date he has not met several of the provisions of the agreement including the transfer of real estate owned by the entireties, to the wife.

A separation agreement between a husband and wife generally provides for the wife's support during the separation and subsequent reconciliation and cohabitation presumably ends the deed of separation. *Com. ex rel. Makowski v. Makowski,* 163 Pa. Superior Ct. 441, 62 A. 2d 71 (1948). The return of this husband to his wife after he told her he was unable to go through with his plans, their living together as man and wife for a period of seven months, visiting friends, celebrating a wedding anniversary and conducting themselves publicly as a happily married couple are wholly inconsistent with the provisions of an agreement releasing the husband from the obligation for the support of his wife. It is clear, by this action, that the parties indicated their intention of abandoning the provisions of the contract. *Com. ex rel. DiValerio v. DiValerio,* 169 Pa. Superior Ct. 477, 82 A. 2d 687 (1951).

Even if he had not returned to his wife, the agreement is void because it was obtained by duress, coercion and fraud. She signed to save her husband from arrest, disgrace and threatened bodily harm. She was persuaded to sign by the false promise of her husband that the divorce and subsequent marriage to the other woman was for the purpose of giving the expected child a name and that he would then remarry her.

We agree with President Judge DANNEHOWER, who wrote the opinion for the court below, where he says: "In our opinion, the separation agreement is manifestly and grossly unfair, unjust, unreasonable and invalid. This good and loving wife was taken advantage of by a self-willed and determined husband to such an extent that it amounts to duress. There can be little doubt that after the husband had the separation agreement prepared according to his own unreasonable terms, and secured a power of attorney from someone in Philadelphia, and having told his wife that he would be arrested, disgraced, lose his position and stock, be in danger from the other woman's brothers and that he would remarry her, took her to his attorney's office where, within an hour, although the papers were read and explained to her, she was divested of her marital rights without the benefit of her own counsel and without fair consideration. All this 40 year old wife was to receive under the agreement was a promised conveyance of an entireties property, the household furnishings, a promise by the husband to pay the carrying charges on the house, certain modest insurances for herself and son, and $20.00 a week for the son and his future education. She was to receive no future support for herself, only $20.00 weekly for the son, and if she remarried, then her husband was excused from fulfilling any payments on the real estate, taxes, insurance. This husband, with a substantial income, working for his father's corporation, and with a father who had been ill for years, and owning over 20,000 shares of a substantial corporation, devised this plan to rid himself of his wife and son and marry another girl. He married the other woman on December 17, 1956 without the knowledge of the prosecutrix, with whom he was then living as husband and wife, and ten days thereafter celebrated his fifteenth wedding anni-

versary with the prosecutrix. It is little wonder that the prosecutrix testified that when she executed both papers, she was shocked, nervous and numb. Such an agreement and conduct we cannot countenance."

It is well settled in this Commonwealth that a valid divorce decree, because of the severance of the marital relationship, terminates the duty of the husband to support his wife. *Com. ex rel. McVay v. McVay,* 177 Pa. Superior Ct. 623, 626, 112 A. 2d 649 (1955). The appellant contends that the wife is barred in any collateral attack against the Mexican divorce because it was rendered with her consent and submission to the jurisdiction of the Mexican court.

With respect to the validity of the Mexican divorce, it is quite evident from the circumstances and the testimony that the appellant never intended to establish a domicile in Mexico. In the case of a decree of a sister State, "Domicile in good faith in the state granting the divorce decree is an essential jurisdictional fact, and if that ingredient is lacking the decree need not be enforced outside the state where it was secured. Where a party leaves the matrimonial domicile, his conduct in obtaining a divorce by allegedly establishing domicile in another state is properly subject to careful scrutiny. . . ." *Com. ex rel. McVay v. McVay,* supra, at page 627.

"The full faith and credit clause binds only the states of the Union and does not apply to decrees of the courts of foreign countries. Such decrees, therefore, depend for their recognition in Pennsylvania, as in other American states, upon comity. The elements of policy which determine whether a decree shall be so recognized have not been fully marked out. Without the establishment of any specific principle of policy, Mexican divorces have been refused recognition in Pennsylvania . . . They are viewed with scant re-

gard for pretended jurisdiction because of public knowledge that they are customarily granted without bona fide residence or domicil. They are generally dismissed with the derogatory description of 'mail order' divorces." Freedman, Law of Marriage and Divorce, §789, 2nd Ed.

The appellant takes comfort from the language of Mr. Justice MAXEY in *Com. ex rel. v. Yarnell*, 313 Pa. 244, at page 250, 169 A. 370 (1933), where he says: "Mexico is a sovereign state and the judgments of its courts are entitled to the respect everywhere accorded the judgments of the courts of sovereign states until those judgments are invalidated in the proper manner in the courts of another jurisdiction. 'Foreign judgments are recognized and enforced in this country because of the comity due by one nation to another and to its courts and decrees': 15 R. C. L., page 907, section 388; Hilton v. Guyot, 159 U. S. 113." This seems to extend the rule, now generally applied to sister states, to the decrees of foreign countries where an appearance is entered, proper service made or personal appearance made by the parties in the jurisdiction of the court. However, Mr. Justice MAXEY goes on to say, at page 251, "However, in order to invalidate the Mexican divorce decree it would have to be shown not only that the then respondent was not in Mexico at the time of the proceedings but that she was never properly served with process, was not represented by counsel, and that the cause of action did not arise in the foreign jurisdiction." This case was ably distinguished on its facts by Judge KELLER of this Court in *Com. ex rel. v. Manzi*, 120 Pa. Superior Ct. 360, 182 A. 795 (1936).

We call again upon the well considered opinion of President Judge DANNEHOWER, where he says: "It is an established and familiar principle that judicial pow-

er to grant a divorce is founded on domicile. In the absence of domicile by at least one of the parties to the action, the Court has no jurisdiction over the cause and its decree will consequently, not be endowed with extraterritorial effect. Williams v. North Carolina, 325 U. S. 226. See also Com. ex rel. McVay v. McVay, 177 Pa. Super. 623; Wallace v. Wallace, 371 Pa. 404. . .

"The defendant in the present case forthrightly admits that he never actually resided in Mexico, let alone intend to establish his domicile there, but that he remained at a hotel across the border in El Paso, Texas, for three days and returned to his home State of Pennsylvania immediately following his necessary appearance before the Mexican Court. There is little or no doubt in our mind that the Mexican Court obtained no jurisdiction over the defendant or the cause of action, despite the purported submission by prosecutrix to its jurisdiction and authority. It is our conclusion therefore that the Mexican Court's judgment and decree is devoid of extraterritorial effect, need not be recognized by this court, and does not bar the right of prosecutrix to proceed against defendant for her support."

Even, if, by the principle of comity, we were to decide that proper submission to the jurisdiction of a foreign country by a defendant would bar her from attacking the jurisdiction of the court, such a rule would not prevail here because the signature to the papers in question, as hereinabove discussed, were obtained by duress, coercion and fraud and are therefore invalid for any purpose.

In the case of *Molnar v. Molnar*, 131 N. Y. S. 2d 120 (1954), where the facts are quite similar to the instant case, a husband and wife executed a property settlement, at which time the husband signed a power

of attorney purporting to authorize a resident of Mexico to enter his appearance, in an action for divorce, which the wife had instituted in Mexico. The Court held that he had never voluntarily appeared in the Mexican court and the power of attorney had no effect in that it was signed in the office of the wife's attorney and under his supervision and direction and because he did not have the benefit of disinterested legal advice. On all the facts the Court held "that the plaintiff did not understand the nature and effect of the power of attorney which he signed, and he never voluntarily appeared in the Mexican court."

Here, the power of attorney was even more devoid of those basic requirements which would render it valid. The wife did not authorize or even designate anyone to act as her attorney in that, the power of attorney was left blank at the time of the signing: See 2 C. J. S., Agency, §27.

The amount which a husband should be ordered to pay for the support of his wife and child is largely in the discretion of the trial court, and unless there is a clear abuse of discretion, its judgment will not be disturbed by the appellate court: *Com. ex rel. Schofield v. Schofield,* 173 Pa. Superior Ct. 631, 98 A. 2d 437 (1953). The primary duty rests upon the trial judge in determining what is a reasonable and proper sum to award for support, and unless there appears to be a clear abuse of discretion, the Appellate Courts are not disposed to disturb the order and substitute their judgment for that of the trial judge.

The court below was not restricted to the appellant's actual earnings as a sole basis for the support order, but it was entitled to consider also his earning power, the nature and extent of his property and all the attendant circumstances. *Com. v. Sgarlat,* 180 Pa. Superior Ct. 638, 121 A. 2d 883 (1956).

A careful examination of this record indicates that the court below gave consideration to all the facts involved in making up the order; that, it is just and reasonable and far from excessive and that certainly there is no abuse of discretion. We can do no better after a careful study of this record than set forth the reasoning of President Judge DANNEHOWER in his opinion as follows:

"As to the reasonableness of the order, the evidence discloses that defendant holds an executive position as treasurer of a corporation and is paid an annual salary of $16,000.00 with additional increments in bonus payments. He also owns 1,975 shares of the corporation's preferred stock which yield annual cash dividends of approximately $1,200.00. Hence, his total gross income is at least $17,200.00. In addition, he holds a one-half remainder interest in 20,278 shares of the corporation's stock from the estate of his father who died in May, 1957.

"Under the present order, defendant is required to pay $40.00 weekly for the support of his 11 year old minor son, Ross, and $20.00 weekly for the support of prosecutrix, a total of $60.00 weekly or $3,120.00 a year. As to the maintenance of the entireties property where prosecutrix and the son reside, he would pay $900.00 a year on the mortgage and interest payments, $179.00 real estate taxes, $27.00 for insurance premiums on house, a total of $1,106.00 on the house plus $3,120.00 support, or a grand total of $4,226.00. This amount for the support of his wife and son and the entireties real estate is less than one quarter of his gross income and not at all unreasonable considering his income, assets, financial condition and station in life.

"The prosecutrix is a reputable first grade school teacher at the Schwenksville Union School and earns

approximately $80.00 a week gross pay. She is required to travel by automobile and conveys her son out of their own school district, to the school where she teaches. This requires an expenditure of $22.00 monthly for the boy's tuition, which amount is included in the order for the minor's support. Under all the circumstances, we do not believe the order for support is unreasonable or excessive."

The appellant complains that the order is indefinite in its terms and not sufficiently clear to allow proper compliance therewith. The portion of the order that is questioned by the appellant reads as follows: ". . . This order shall remain in effect in said amount as long as the wife and son occupy the Creamery home, and the defendant pay the carrying charges as he is now doing . . ." The record discloses that the appellant explained at great length that he is presently paying the mortgage, insurances and taxes on the dwelling, held by the entireties, where his wife and son live. The order provides that he shall pay the carrying charges as he is now doing. The payments are set forth in detail in the opinion of the court below where it is stated that the appellant would pay $900 a year on the mortgage and interest payments, $179 real estate taxes and $27 insurance premiums. This portion of the order he was already paying. It is clear and definite and should leave no uncertainty in the mind of this husband who left his wife with the message that he would die loving her.

Order affirmed.