## Morton Estate

*Frank E. Coho* and *Thomas P. Shearer,* for petitioner.

*James M. Houston* and *John D. Houston, 2nd, Houston, Cooper, Speer & German,* for respondent.

*Charles F. McKenna,* for guardian ad litem.

*Roy Thomas Clark,* and *Kenney, Stevens, Clark & Semple,* for administrator c.t.a.

HAY, J., December 18, 1969.—This proceeding comes before this court on the petition of Edith E. Collins, a/k/a Edith C. Morton, hereinafter referred to as the "petitioner," to vacate the election to take against the will of William Alfred Morton, deceased,

hereinafter referred to as "Morton," filed by Mollie E. Morton, hereinafter referred to as "Mollie."

Morton died on December 24, 1967, leaving a holographic will dated April 1, 1966, which was duly probated in the office of the Register of Wills of Allegheny County at no. 5683 of 1967, the Union National Bank of Pittsburgh being appointed administrator c.t.a.

On December 20, 1968, Mollie filed notice of her election to take against Morton's will in the Orphans' Court Division of the Court of Common Pleas of Allegheny County. Prior to filing the petition to vacate Mollie's election to take against Morton's will, petitioner had also filed two other petitions: First, to extend the time for her as alleged surviving spouse to file her election to take against Morton's will, and second, a petition for the family exemption. No action has been taken by this court on either of these petitions pending the disposition of the petition to vacate Mollie's election to take against Morton's will. . . .

## DISCUSSION

On October 30, 1919, Mollie and Morton were married in Bellaire, Ohio, after which they made their home at 1512 Westfield Avenue, Beechview, Pa., three sons being born of the aforesaid marriage. In 1930, while on a business trip to Europe, Morton met one Hilda Snitkin, a divorcee, and from that time on this case takes on aspects which one might expect to find in a Victorian novel. Morton, after meeting Hilda, toured Europe with her and upon his return never again rejoined Mollie at their home on Westfield Avenue. A bitter and disappointed Mollie then secured the services of James Millholland, Esq., a former judge of this court, to advise her of her marital rights and as to whether or not she should seek a divorce. Judge Millholland advised Mollie to do noth-

ing, since it was his opinion that Morton would never be able to procure a divorce from Mollie which would be recognized in this Commonwealth. In May of 1934, Morton apparently filed a divorce action against Mollie in Juarez, Mexico, wherein a decree of divorce was entered on June 13, 1934. This Mexican proceeding was neither opposed by Mollie nor did she enter any appearance, nor was an appearance entered for her. After the decree of divorce had been granted by the Mexican court, Morton apparently went through a marriage ceremony of sorts with Hilda Snitkin in Hoboken, N. J., and thereafter they returned to Pittsburgh and lived in Mt. Lebanon until Hilda's death in August 1953.

After Morton left his home in Beechview, which he had shared with Mollie in 1931, he had little or no contact with her with the exception of checks sent to her each January for her support and that of his children. During the later years of Morton's life, his annual checks were in the amount of $3,000, and continued long after his sons had become men and left their home which they had shared with their mother in Beechview.

The initial issue, therefore, facing this court is whether or not Morton's Mexican divorce was a valid one that would be recognized in this Commonwealth. In Commonwealth ex rel. Thompson v. Yarnell, 313 Pa. 244 (1933), Mr. Justice Maxey, speaking for the Supreme Court of Pennsylvania, stated, at page 251:

"It is true that a foreign divorce may be attacked collaterally by the defendant spouse where his or her rights are involved. It may also be attacked by persons claiming under the defendant spouse. The right to impeach collaterally a decree of divorce made in another state by showing fraud or want of jurisdiction has been frequently recognized. See German Savings & Loan Society v. Dormitzer, 192 U.S. 125, 128;

Andrews v. Andrews, 188 U.S. 14, 39; 19 C.J., page 375, sections 844, 845; Rex v. Brinkley, 14 Ont. L.R. 434, and Rex v. Lolley, 168 English Reports 779. Third persons whose rights are concerned may under certain circumstances attack a divorce collaterally. See Adams v. Adams, 154 Mass. 290, 28 N.E. 260, and Hollingshead v. Hollingshead (N.J.), 110 Atl. Rep. 19, syllabus 3.

"However, in order to invalidate the Mexican divorce decree it would have to be shown not only that the then respondent (the first Mrs. Yarnell) was not in Mexico at the time of the proceedings but that she was never properly served with process, was not represented by counsel, and that the cause of action did not arise in the foreign jurisdiction. See Grossman's Est. (No. 1), 263 Pa. 139, 106 A. 86; Duncan v. Duncan, 265 Pa. 464, 109 A. 220, and Haddock v. Haddock, 201 U.S. 562."

See also Commonwealth ex rel. v. Manzi, 120 Pa. Superior Ct. 360 (1936); Commonwealth v. Doughty, 187 Pa. Superior Ct. 499 (1958); Commonwealth ex rel. Thompson v. Yarnell, 313 Pa. 244 (1933); and Commonwealth ex rel. Poet v. Poet, 89 Dauph. 250 (1968).

Petitioner relies heavily upon the case of Franzen v. E. I. DuPont deNemours and Co., Inc., 146 F. 2d 837, for the proposition that full faith and credit must be given in each State to the public acts, records and judicial proceedings in another State. Admittedly, the validity of a marriage is to be determined by the place where the marriage is contracted and if valid there according to the law of the State where it is contracted, a marriage is regarded as being valid in every other State: Loughran v. Loughran, 292 U.S. 216. With this proposition, this court is not in dispute. However, in the case presently before us, we are not concerned with a marriage contracted in one State

being valid in another State, but with the proposition of a divorce being granted in one country and being recognized in another. In Perrin v. Perrin, 408 F. 2d 107 (1969), also relied upon by petitioner, the court was confronted with a similar problem, and there the court stated:

"It is true, as the plaintiff now argues, that domicile is regarded as the basis for jurisdiction to grant a divorce in the United States. Granville-Smith v. Granville-Smith, 1955, 349 U.S. 1, 75 S. Ct. 553, 99 L. Ed. 773. It is likewise true that a divorce decree may be collaterally attacked for lack of domiciliary jurisdiction, Williams v. North Carolina, 1945, 325 U.S. 226, 65 S.Ct. 1092, 89 L. Ed. 1577, 157 A.L.R. 1366, if the defendant was not personally served and did not appear. But it is equally well settled that if the defendant was personally served or did actually appear in the action, he is estopped from impeaching the resulting divorce decree, whether the domiciliary jurisdiction was contested by the defendant, Sherrer v. Sherrer, 1948, 334 U.S. 343, 68 S.Ct. 1087, 92 L.Ed. 1429, 1 A.L.R. 2d 1355, or was admitted by him, Coe v. Coe, 1948, 334 U.S. 378, 68 S.Ct. 1094, 92 L.Ed. 1451, 1 A.L.R. 2d 1376.

"The Sherrer and Coe cases involved divorce decrees which had been entered in Florida and Nevada, respectively, and involved the application thereto of the full faith and credit clause of the federal Constitution. *Here, however, we are dealing with a decree of a foreign state as to which the principles of comity, rather than full faith and credit, apply.* Ordinarily, the recognition in the United States of such a foreign decree will depend upon whether *at least one of the spouses was domiciled in the foreign state when the decree of divorce was rendered. Certainly 'mail order' divorce decrees in which neither spouse has appeared personally in the foreign jurisdiction are*

*not recognized here. And this appears to be equally true in the case of ex parte divorce decrees in which an absent defendant is served only extraterritorially or constructively and does not actually appear or file an answer in the action."* (Italics supplied.)

It must also be noted, however, that Perrin and Rosenstiel v. Rosenstiel, 16 N.Y. 2d 64 (1965), involved bilateral divorce proceedings wherein plaintiff was personally present in the foreign State and appeared in the foreign court and defendant appeared in that court by counsel and filed a consenting answer. The voluntary appearance of the other spouse in the foreign court by an attorney tended to give support to the proposition that that court had acquired jurisdiction over the marriage as a legal entity, as it is almost universally accepted in all jurisdictions that submission under judicial authority would give a court jurisdiction over the parties before it. However, inasmuch as the instant case does not involve a bilateral divorce and is readily distinguishable, therefore, from the Perrin and Rosensteil cases, it need not be discussed here any further.

In Commonwealth ex rel. v. Manzi, 120 Pa. Superior Ct. 360 (1936), a wife who had been deserted by her husband was seeking support for her two children. At the time of the hearing, defendant appeared and filed an answer in which he alleged that petitioner was no longer his wife, as he had, on December 21, 1934, obtained a decree of absolute divorce from her. In a subsequent hearing, he produced a certificate and record of a final divorce decree rendered in his favor by the First Civil Court, Bravos District, State of Chihuahua, Mexican Republic.

Petitioner-wife testified that she had not been in Mexico during the years 1933 and 1934; that she had not been served with process relative to the divorce action within the Republic of Mexico, nor had she en-

tered an appearance in said action. Attached to the husband's divorce decree was a certificate issued by the Vice Consul of the United States of America at Ciudad Juarez, Chihuahua, Mexico, which reads as follows, at page 363:

" 'For the contents of the annexed document and the legal effect, if any, it may have in the several states of the United States the consulate can assume no responsibility,' together with a summary of two decisions of the Supreme Court of Mexico declaring certain divorces obtained in the States of Mexico and Morelos, respectively, invalid, to wit: ' "The authority competent to try a divorce case is the judge having jurisdiction where the husband and wife are domiciled; and according to Article 27 of the Civil Code of the Federal District, in order to acquire domicile it is not sufficient to live at a certain place but necessary that the residence be habitual." No. 2336, 1929, 2nd Section.' ' "If it is established that the defendant in a suit for divorce in the State of Morelos has his domicile without that Federal Entity, even though notice has been given by means of publication in the Diario Official of this State, it shall be considered that service has not been properly made and that, consequently, injunction against the sentence given may be granted since the defendant has not been given an opportunity to defend himself because of lack of notice." No. 3485, 1930, 2nd Section.' "

As our Superior Court then went on to point out, at page 364:

"The Mexican record did not set forth when Nicola Manzi came to live in the State of Chihuahua, Mexico, so that it might be determined whether his 'residence was habitual.'

"In this proceeding by the wife, Ersilia Manzi against her husband, Nicholas (Nicola) Manzi, for support, the defendant, who has come back to Phila-

delphia and resumed his residence here, produces this decree of divorce from the Civil Court of the Bravos District, State of Chihuahua, Republic of Mexico, and asserts that the comity of nations requires that the courts of this State shall give full force and effect to it, notwithstanding the effect of such a ruling would be to nullify and set aside a prior judgment of this court on the same subject matter, and notwithstanding the decree on its face shows that the wife, Ersilia Manzi was not within the jurisdiction of the Mexican Court and had not appeared or been represented by counsel. *The attempted service of process on Mrs. Manzi by the sheriff of Philadelphia County, if made, was of no effect to compel her appearance and answer in a foreign jurisdiction. The sheriff of Philadelphia County has no right and authority, by virtue of his office, to make legal service, binding within this State, of process issued by the courts of a foreign state:* Ralston's App., 93 Pa. 133; Colvin v. Reed, 55 Pa. 375, 380, 381; Coleman's App., 75 Pa. 441; Overseers of Limestone Twp. v. Overseers of Chillisquaque, 87 Pa. 294; Steel v. Smith, 7 W. & S. 447, 450; Rogers v. Burns, 27 Pa. 525, 527; Pennoyer v. Neff, 95 U.S. 714. *For the purposes of this case the decree of divorce relied on is, within this State, of no valid force and effect.*" (Italics supplied.)

Moreover, it seems perfectly clear from the record that even if Morton was in Mexico for the purpose of starting this divorce proceeding, he never intended to acquire a Mexican domicile. As our Supreme Court pointed out in Loudenslager Will, 430 Pa. 33 (1968), at pages 37-8:

" 'The domicile of a person is the place where he has voluntarily fixed his habitation with a present intention to make it either his permanent home or his home for the indefinite future. (citing cases) To effect

a change of domicile there must be a concurrence of the following factors: (1) physical presence in the place where domicile is alleged to have been acquired, and (2) an intention to make it his home without any fixed or certain purpose to return to his former place of abode.' "

In the instant case, our review of the record reveals that Mollie was not in Mexico at the time of the divorce proceeding which took place there; that she was not properly served with process; that she did not appear and was not represented by counsel at the time of the hearing; that the alleged grounds for divorce, if any existed, arose within this Commonwealth, and the Mexican court had no jurisdiction over her person. In addition, this court is of the opinion that Morton never established a domicile in Mexico. This court, therefore, finds that under these circumstances the Mexican divorce was a nullity insofar as its effect on the state of the marriage relationship between Morton and Mollie was concerned.

The next issue before this court is whether or not Mollie's conduct was such as to estop her from her election to take against Morton's will. Petitioner relies heavily on Watt Estate, 409 Pa. 44 (1962), apparently for the presumptions of innocence in contracting a second marriage as well as the validity of a second marriage, the former furnishing the rationale for the latter. She requests this court to find as a fact the following:

"21. Because William A. Morton was ceremoniously married to Hilda S. Morton from 1934 to 1953 and no question of the validity of that marriage was ever raised by anyone having a right to raise such question, William A. Morton again became a single man, eligible to remarry upon the death of Hilda S. Morton on August 12, 1953."

This court is of the opinion that it cannot make a finding such as requested by petitioner. Underlying the aforementioned presumption in Watt Estate is the presumption that parties to the second marriage did so innocently and without criminal or wrongful purpose or intent and the law will infer matrimony rather than concubinage. This presumption, of course, must be taken in conjunction with two well-established principles of law: First, that decedent could not marry another person unless the valid prior marriage had been dissolved either by death or by divorce; second, upon proof of a valid marriage, the law presumes that such marriage continues until the death of one of the parties or a divorce is proven; Schaefer v. Schafer, 189 Pa. Superior Ct. 120. This was clearly pointed out by the late President Judge Keller, speaking for the Superior Court in Madison v. Lewis, 151 Pa. Superior Ct. 138 (1943), as quoted in Watt Estate, supra, at page 52, as follows:

" 'When a valid marriage is proven, the law presumes that it continues until the death of one of the parties (actual or presumptive after seven years), or a divorce is shown. Without either of these appearing if one of the parties marries again, while another presumption arises that it is innocent, that alone is not sufficient to overcome the previously existing presumption of the continued validity of the first marriage. The second presumption does not of itself destroy the first but requires some proof of facts and circumstances to be given the effect of overcoming the first; as for instance, the long lapse of time during which the other party may be presumed to have died, the question of legitimacy of a child of the second marriage, the fact that the other spouse had likewise remarried and proof that the decedent, whose heirs are attacking the second marriage, had himself recognized the validity of it.' "

The Supreme Court went on to say:

*"To hold that the presumption of innocence and the presumption of the validity of a second marriage per se overcome the presumption that a valid marriage once established continues until the contrary is proven would result in a situation where the presumption of innocence and presumption of the validity of the second marriage 'could be applied with equal effect to validate every case of meretricious relations, of which scores or more have been rejected as invalid in the Supreme Court and this court.'* Sharpe v. Federal Cleaning Co., 144 Pa. Superior Ct. 231, 242, 19 A. 2d 509. In Sharpe, supra, the court approved the following language of the court below: ' ". . . Something more than legal presumption was required to establish the fact that Claude E. Sharpe had been freed from his marital contract with Rachel Sharpe so that he could contract a new marriage with Amanda Sharpe. A man cannot at the same time legally have two wives; and one who has married once cannot lawfully marry again unless the first marriage has been dissolved by absolute divorce or by death. . . . The marriage of a man or woman, where one of them has by a prior marriage a husband or wife who is then living and undivorced, is not merely voidable, but void, whether it be meretricious or founded in mistake." '

"The real thrust of the several presumptions is to place the burden of proving the invalidity of the second marriage upon the person who claims such invalidity and to *require proof of some nature that the first marriage was not dissolved by death or divorce at the time of the second marriage.* From the presumption in favor of the validity of the second marriage and the presumption of innocence upon the part of the parties to that marriage there follows, as a corollary, another presumption, i.e., that either

death or divorce had terminated the prior marriage, and he who claims the invalidity of the second marriage must overcome that presumption by proof of some nature: Wile's Estate, 6 Pa. Superior Ct. 435; Holben's Estate, 93 Pa. Superior Ct. 472; Thewlis's Estate, 217 Pa. 307." (Italics supplied.)

Bearing the above principles in mind, we must view them in conjunction with the testimony and uncontradicted evidence presented at the hearing on this matter. The record reveals, and it is not denied, that Morton went through a valid marriage ceremony with Mollie and that later Morton attempted to dissolve this valid marriage by obtaining a Mexican divorce, which was and is not valid in this Commonwealth for reasons previously stated and which need not be repeated. Other undisputed evidence before this court reveals that Morton continued to support Mollie until the time of his death, and long after their children had grown and left the home of their mother seeking their own places in the world. This court cannot ignore the fact that this support of Mollie alone continued regardless of there being no obligation on the part of a husband to support his former wife after a decree of divorce. However, Morton's continued support of Mollie can only lead this court to assume that Morton had grave doubts as to whether or not his Mexican divorce was a valid one. This assumption on the part of the court is buttressed by Morton's will, as probated, wherein he states he seriously doubts the validity of the Mexican divorce.

Admittedly, the undisputed evidence before this court shows that the parties lived separate and apart from 1931 until Morton's death. There is not one scintilla of evidence, however, that this was a consensual separation. These facts, assumptions which this court feels are adequately supported by the undisputed evidence, testimony, and Morton's will, show beyond

doubt that Morton's first marriage to Mollie was never dissolved either in his own mind or under the laws of this Commonwealth.

We must next consider Mollie's conduct and whether it was such as to estop her being a claimant of Morton's estate. As was pointed out in Watt Estate, supra:

" 'The essential elements of an equitable estoppel as related to the party estopped are: (1) conduct which amounts to a false representation or concealment of material facts, or at least which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intention, or at least expectation that such conduct shall be acted upon by the other party; (3) knowledge, actual or constructive, of the real facts. As related to the party claiming the estoppel, they are: (1) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party estopped; and (3) actions based thereon of such a character as to change his position prejudicially': 19 Am. Jur. Estoppel §42, pp. 642, 643."

In applying the principles of estoppel as are set forth in Watt Estate, supra, and quoted above to the case at bar, this court finds the record void of any conduct on the part of Mollie which amounted to a false representation or concealment of material facts or was at least calculated to convey the impression that the facts were otherwise than, and inconsistent with, those which she is presently attempting to assert.

Admittedly, the parties were long separated and Mollie was aware that there had been an attempt to obtain a Mexican divorce and that Morton and his second wife, Hilda, were living together in Mt. Lebanon. However, the record also reveals that Mollie

was relying upon the advice of eminent counsel as to her actions, and that she had been advised by her counsel that the Mexican divorce would never be recognized as being valid within this Commonwealth. Moreover, Mollie also had three small boys to raise and she obviously did not want to "overturn the applecart" insofar as their support from Morton was concerned. As long as she was receiving this support, Mollie did exactly what she was advised to do, "nothing."

Much ado is also made by petitioner of the fact that Mollie was aware that a marriage ceremony had taken place involving Morton and Hilda (wife no. 2) and she did not contest the validity of the same. However, the advice of Mollie's counsel, as has been previously stated, is equally applicable to this contention. Moreover, the record does not reveal that Mollie was ever aware that at the time of the death of wife no. 2 that Morton probated her estate as her husband. This fact must certainly be considered by this court, but it cannot be used against Mollie, as she was certainly not aware of it.

Inasmuch as this court has been offered no proof that petitioner was ever lawfully married to Morton other than as previously set forth, nor that petitioner in any way relied upon the conduct of Mollie, it is difficult for this court to understand that petitioner changed her position prejudicially as a result of Mollie's conduct.

Inasmuch as the record is barren of any testimony or undisputed evidence or inferences therefrom that petitioner, Edith C. Morton, a/k/a Edith E. Collins, was aware of Mollie's existence, or knew the manner in which she was living, or acted prejudicially because of some actions on the part of Mollie, this court is obliged to find that the doctrine of equitable estoppel is not applicable to petitioner.

The record is also entirely void of any evidence that Mollie's manner of living was more consistent with a single woman rather than that of a married one. While Mollie apparently knew of the apparent Mexican divorce, she still was of the opinion that her marriage to Morton was still in effect. However, there is not a scintilla of evidence before this court from which it could be inferred that Mollie had acted or intended to convey the impression to petitioner that she was single with the intention that petitioner relied upon the same. Moreover, the record reveals that Mollie had never even met petitioner. Therefore, this court, on the basis of the record before it and the undisputed evidence, finds that petitioner did not, in fact, rely upon the conduct of Mollie in any way, and if there was any fraud practiced on anyone before this court, the fraud and deception were practiced upon Mollie herself by decedent and certainly the sins of decedent should not be visited and inflicted on the innocent and injured Mollie.

It is the view of this court, therefore, that the marriage of decedent and Mollie was never terminated by divorce and at the time of his death she was his lawful wife and, as such, is entitled to pursue her election to take against the will of decedent.

## CONCLUSIONS OF LAW

1. The Mexican divorce secured by Morton is not a valid divorce in this Commonwealth.

2. Mollie E. Morton, the respondent herein, is the widow of William Alfred Morton.

3. Mollie E. Morton, the respondent herein, has not forfeited her right to elect to take against Morton's will by virtue of the provisions of section 9(b) of the Wills Act of April 24, 1947, P. L. 89, 20 PS § 180.9(b).

4. Mollie E. Morton, the respondent herein, is not estopped in her election to take against Morton's will.

5. The petition to vacate respondent's, Mollie E. Morton, election to take against Morton's will is dismissed.

## ORDER OF COURT

And now, December 18, 1969, after consideration of the petition of Edith E. Collins, a/k/a Edith C. Morton, to vacate the election to take against the will of William Alfred Morton, deceased, by Mollie E. Morton, and after hearing the testimony thereon, and after considering briefs as filed, it is hereby ordered, adjudged and decreed that the petition of Edith E. Collins, a/k/a Edith C. Morton, to vacate the election of Mollie E. Morton to take against the will of decedent is dismissed.