H. David Boyter, Petitioner v. Commissioner of Internal Revenue, Respondent

Angela M. Boyter, Petitioner v. Commissioner of Internal Revenue, Respondent

Docket Nos. 11445–77, 11446–77.     Filed August 6, 1980.

*Marvin J. Garbis* and *Paula M. Junghans,* for the petitioners.
*Charles B. Zuravin,* for the respondent.

Wilbur, *Judge:* Respondent determined a deficiency in income tax due from petitioner H. David Boyter for the years 1975 and 1976 in the amounts of $580.36 and $1,221, respectively. Respondent determined a deficiency in income tax due from petitioner Angela M. Boyter for the years 1975 and 1976 in the amounts of $617.98 and $716, respectively. The cases have been consolidated for trial, briefing, and opinion since they involve the same issue, namely, whether petitioners were unmarried at the end of the tax years in question and thus entitled to use the corresponding single person's rate schedule, or whether they were in fact married to each other and thus ineligible to use the rate schedule applicable to single individuals.

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

Petitioners Angela M. Boyter and H. David Boyter resided in Ellicott City, Md., at the time the petitions were filed in this case. Each filed his or her Federal income tax return for 1975 and 1976 as a single person.

Petitioners were married in Baltimore, Md., on April 2, 1966. For the years 1966 through 1974 inclusive, they filed Federal income tax returns as a married couple, filing either jointly, or as married individuals filing separately. Petitioners reside in a home which they purchased as tenants by the entirety on October 26, 1967. Petitioners also acquired real property located in Calvert County, Md., as tenants by the entirety on December 23, 1969.

Petitioners discovered that their tax liability would be lowered if they filed their returns as single persons and investigated the possibility of obtaining yearend divorces. Petitioner Angela Boyter went to a library in Baltimore, Md., located the name of seven Haitian attorneys, and contacted each seeking estimates. Petitioners traveled to Haiti in late 1975. They obtained a divorce decree from the Republic of Haiti on December 8, 1975. Angela Boyter was the complainant in the proceedings and appeared personally in the Haitian court with her lawyer. David Boyter filed a submission to jurisdiction with the Haitian court. The Haitian court found that Angela Boyter was living and domiciled at 37 Old Annapolis Road, N. Linthicum, Md. The Haitian court found that David Boyter was living and domiciled at 3914 MacAlpine Road, Ellicott City, Md. The ground upon which the divorce decree was based was incompatibility of character. After returning from Haiti, petitioners obtained a marriage certificate from Howard County, Md., on January 9, 1976.

In November of 1976, petitioners traveled to the Dominican Republic. They obtained a divorce decree from the Dominican Republic on November 22, 1976. This time, David Boyter was the complaining party; he personally appeared with his attorney, and Angela appeared through her attorney. The ground upon which the decree was based was incompatibility of temperaments making life together unbearable. The Dominican court found that David Boyter was domiciled in Maryland and that Angela Boyter was domiciled in Ellicott City, Md. On February 10, 1977, petitioners again obtained a marriage certificate from Howard County, Md.

Petitioners sought and obtained their divorce decrees solely in order to render themselves unmarried as of December 31 for the years 1975 and 1976 so that they could file income tax returns as unmarried individuals. Petitioners never intended to and never did physically separate from each other prior to or subsequent to either of the divorces. Rather, they have continued to reside together in the home they purchased in 1967. At all times during 1975 and 1976, petitioners were domiciled in Maryland.

Petitioners have been Federal Civil Service employees for several years prior to 1975 until the present time. Under the Federal Civil Service system, the petitioners were entitled to the benefits of survivor annuities pursuant to 5 U.S.C. sec. 8301 et seq., and to disability benefits pursuant to 5 U.S.C. sec. 8101 et seq., so long as they were lawfully married. Prior to November 19, 1976, neither petitioner had executed a last will and testament. On November 19, 1976, each petitioner executed a last will and testament.

## OPINION

We are called upon to decide a rather unique and controversial case involving two individuals who availed themselves of perfunctory yearend divorces in foreign countries in order to render themselves unmarried for the purposes of the tax law. The monetary savings from such an endeavor stem from the differing rate schedules for married persons and single persons and the interplay of a progressive tax structure with income aggregation for married couples.

A married couple filing a joint return are taxed on their total combined income and, as for all taxpayers, the marginal tax rate increases as total income increases. Reflecting income splitting enacted in 1948, the rate schedule for married couples filing jointly is somewhat lower than it is for single persons. Consequently, if one partner of the marriage produces all or most of the income, he or she pays less tax than if single. However, if both spouses work, the second income is piled on the first, and is thus in a higher marginal tax bracket than if it stood alone. Because the higher tax bracket can more than negate the lower rate schedule for couples filing jointly, when two people who earn somewhat comparable salaries decide to marry, they

unhappily discover that their total tax bill is higher than it was before they were wed.[1]

Not surprisingly, this marriage penalty is viewed by many people, including the petitioners, as onerous and unfair. After calculating just how much matrimonial bliss was costing them and after petitioning Congress in vain to remedy the situation, petitioners decided that they would take advantage of section 143(a) and section 6013(d)(1)(A)[2] which provide that the marital status of an individual is to be determined at the *end* of his or her tax year—in this case, on December 31.[3] Thus, the Boyters journeyed to Haiti in December of 1975 and obtained a Haitian divorce decree. Angela appeared in court as the complainant, with her lawyer, and David filed a consent to jurisdiction and a power of attorney. They then returned to Maryland and remarried in January of 1976. Petitioners went through essentially the same divorce/remarriage procedure at the end of 1976 and the beginning of 1977, except this time they obtained the

---

[1]We should add that if they continue to file separate returns, they can no longer use the rates applicable to single individuals, but must use still another schedule with higher rates applicable to married individuals filing separate returns. Undoubtedly, all this confusion is a bit bewildering to the average citizen who may assume that simple justice and administrative convenience would be best served by taxing income to the individual who earns it pursuant to one rate schedule uniformly applicable to all. Indeed, this was the rule for a considerable period of time after the income tax was enacted, and a substantial effort was made to prevent its erosion. See *Lucas v. Earl*, 281 U.S. 111 (1930); and *Helvering v. Eubank*, 311 U.S. 122 (1940) (preventing the deflection by a husband to a wife of a part of his future earnings; and preventing deflection of earnings from services previously rendered. Nevertheless, Congress, through the years, responded to a variety of problems on an ad hoc basis, and we now have still another problem, the "marriage penalty." For a good introduction to the problem of the marriage penalty, see W. Gerzog, "The Marriage Penalty: The Working Couple's Dilemma," 47 Fordham L. Rev. 27 (1978). An in-depth discussion of the problems presented is found in B. Bittker, "Federal Income Taxation and the Family," 27 Stan. L. Rev. 1389, 1416–1444 (1975).

[2]All section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

[3]Sec. 143(a) provides:

SEC. 143. DETERMINATION OF MARITAL STATUS.

(a) GENERAL RULE.—For purposes of this part—

(1) The determination of whether an individual is married shall be made as of the close of his taxable year; except that if his spouse dies during his taxable year such determination shall be made as of the time of such death; and

(2) An individual legally separated from his spouse under a decree of divorce or of separate maintenance shall not be considered as married.

Sec. 6013(d)(1)(A) (dealing with joint returns) provides:

SEC. 6013(d). DEFINITIONS.—For purposes of this section—

(1) the status as husband and wife of two individuals having taxable years beginning on the same day shall be determined—

(A) if both have the same taxable year—as of the close of such year; * * *

divorce decree from the Dominican Republic, and David appeared in court as the complainant. For both 1975 and 1976, they filed Federal income tax returns as single persons, thereby reducing their total tax liability.

The precise issue for our decision is whether petitioners are entitled to file as single individuals for the tax years 1975 and 1976. Respondent contends that petitioners were married individuals for those years because: (1) The foreign divorces would not be recognized as valid in Maryland, the State in which petitioners reside, since the foreign courts did not have subject matter jurisdiction over the divorce proceedings; (2) the divorces would not be recognized as valid in Maryland because petitioners made material misrepresentations to the foreign courts, thereby perpetrating a fraud on the courts; and (3) even if the divorce decrees are recognized as valid for State law purposes, they should be disregarded for Federal income tax purposes because a yearend divorce whereby the parties intend to, and do in fact, remarry early in the next year is a sham transaction that may be disregarded for Federal income tax purposes.[4]

Conversely, petitioners maintain that they are entitled to file as single individuals because they obtained valid foreign divorces, recognizable in Maryland, which rendered them unmarried on December 31 of both years. Furthermore, petitioners argue that the divorces were not shams because there are substantial nontax effects emanating from their divorced status, and that, in any event, the cases dealing with sham transactions are inapplicable to the determination of marital status. We agree with respondent that Maryland would not recognize the foreign divorces as valid because the foreign courts lacked subject matter jurisdiction over the divorce proceedings.[5]

---

[4] Respondent's third argument is articulated in Rev. Rul. 76–255, 1976–2 C.B. 40.

[5] For this reason, we do not reach respondent's other arguments. Petitioners characterize respondent's argument that the divorces are invalid under State law as a "new matter," contending he should bear the burden of proof under Rule 142, Tax Court Rules of Practice and Procedure. Petitioners point to the fact that the deficiency notice recites only Rev. Rul. 76–255, 1976–2 C.B. 40, in which respondent assumed the validity of foreign divorces under State law but ruled that nonetheless, the couple was married because of the sham transaction theory. Respondent contends that the argument as to the validity of the divorces under State law is not a new matter, but simply a different approach as to why the divorces are not to be recognized. We assume, without deciding, that the purely legal question of the validity of the divorces under State law is a new matter first raised by respondent at trial for which he bears the burden of proof. In any event, it does not change the result in this case.

We also agree with the assertion emphatically made by respondent on brief that "the Tax Court is bound by state law rather than federal law when attempting to construe marital status." Except in a few specific situations,[6] the definition of "husband and wife," or "marriage" is not addressed in the Internal Revenue Code, even though the application of many provisions of the statute turns on the marital status of the taxpayer.[7] It has consistently been held that for Federal income tax purposes, the determination of the marital status of the parties must be made in accordance with the law of the State of their domicile. *Dunn v. Commissioner*, 70 T.C. 361 (1978); *Estate of Goldwater v. Commissioner*, 64 T.C. 540 (1975), affd. 539 F.2d 878 (2d Cir. 1976), cert. denied 429 U.S. 1023 (1976); *Estate of Steffke v. Commissioner*, 64 T.C. 530 (1975), affd. 538 F.2d 730 (7th Cir. 1976), cert. denied 429 U.S. 1022 (1976); *Gersten v. Commissioner*, 28 T.C. 756 (1957), affd. on this issue 267 F.2d 195 (9th Cir. 1959); *Eccles v. Commissioner*, 19 T.C. 1049 (1953), affd. per curiam 208 F.2d 796 (4th Cir. 1953). The rationale for deferring to State law is that domestic relations is "an area that has long been regarded as a virtually exclusive province of the States." *Sosna v. Iowa*, 419 U.S. 393, 404 (1975); see also *Pennoyer v. Neff*, 95 U.S. 714, 734–735 (1878); *Lee v. Commissioner*, 64 T.C. 552 (1975), affd. 550 F.2d 1201 (9th Cir. 1977).

With regard to the provisions for filing a joint return or filing as an unmarried individual, it has been held that State law is determinative on the question of the recognition of common law marriage (*von Tersch v. Commissioner*, 47 T.C. 415 (1967)); the effect of an invalidated Mexican divorce decree (*Untermann v. Commissioner*, 38 T.C. 93 (1962)); the effect of an interlocutory divorce decree (*Eccles v. Commissioner, supra*); and whether the taxpayer is legally separated under a decree of separate maintenance (*Dunn v. Commissioner, supra*). State law has also been followed on the issue of whether the taxpayers are "husband and wife" under section 1239 which mandates ordinary income treatment in the sale of property between certain related parties (*Deyoe v. Commissioner*, 66 T.C. 904 (1976)), as well as

---

[6]See, for example, sec. 143(b).

[7]By one estimate, there are more than 40 sections of the Internal Revenue Code under which differing tax consequences may result due to the marital status of the taxpayer. See G. Douthwaite, Unmarried Couples and the Law 191 (1979).

whether a person is a "surviving spouse" within the meaning of section 2056, the marital deduction provision. *Estate of Steffke v. Commissioner, supra; Estate of Goldwater v. Commissioner, supra.* These decisions reflect a consensus that marriage and divorce generally relate to the most intimate and personal of human interaction and are thus better defined by the one entity which has traditionally exercised exclusive regulation and control over these matters.

Unfortunately, from our standpoint, the law in Maryland with regard to the recognition of migratory divorces obtained in a foreign country by Maryland domiciliaries has not been explicitly declared by either the legislature or the highest court of that State. In fact, neither the parties nor we can find even a lower court decision which rules on the validity of a divorce such as this one, where admittedly both parties remained domiciled in Maryland throughout the divorce proceedings. The absence of a definitive answer to our dilemma from the courts in Maryland, however, does not allow us either to avoid this necessary determination or to simply decide what we ourselves think the rule ought to be. Rather, we must choose the rule we believe the highest State court would adopt if faced with the question. *Commissioner v. Estate of Bosch,* 387 U.S. 456, 465 (1967). See also C. Wright, Law of Federal Courts 269–271 (3d ed. 1976).

It appears reasonably clear to us in surveying the traditional notions of what empowers a tribunal to render a valid divorce decree and the way in which migratory foreign divorces[8] have been viewed in other States, that Maryland would not recognize the Haitian and Dominican divorces as valid. The recognition of divorces obtained in a foreign country is ruled by the principles of comity.[9] It is well settled that a foreign divorce decree will not

---

[8]Whenever the term "foreign divorce" is used in this opinion, it refers specifically to a divorce obtained in a foreign country, as opposed to a divorce obtained in another State of the United States.

[9]An often quoted definition of comity is:

"'Comity,' in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws. [*Hilton v. Guyot,* 159 U.S. 113, 163–164 (1895).]"

A recent decision from an appeals court in Maryland quoted with approval the rule as articulated in *Litvaitis v. Litvaitis,* 162 Conn. 540, 295 A.2d 519 (1972):

be recognized as valid where the foreign tribunal lacked the jurisdiction, or power, to render the judgment. See 1 Restatement, Conflict of Laws 2d, sec. 98, comment c (1971); 24 Am. Jur. 2d, Divorce and Separation, sec. 964; *Wolff v. Wolff,* 40 Md. App. 168, 389 A.2d 413 (1978). Historically, in this country, jurisdiction to grant a divorce has been founded on the concept of domicile. H. Goodrich, Conflict of Laws, sec. 127 (4th ed. 1964). As stated by Justice Frankfurter:

> Under our system of law, judicial power to grant a divorce—jurisdiction, strictly speaking—is founded on domicile * * * . The framers of the Constitution were familiar with this jurisdictional prerequisite, and since 1789 neither this Court nor any other court in the English-speaking world has questioned it. [*Williams v. North Carolina,* 325 U.S. 226, 229 (1945).]

*Williams v. North Carolina, supra,* established the rule that domicile of at least one of the spouses is necessary in order for a divorce decree rendered by one State of our Federal system to be accorded compulsory recognition by all of the other States under the full faith and credit clause of the United States Constitution. Since domicile is considered such an integral part of a tribunal's power to adjudicate a divorce, and probably because it would appear peculiar to more readily recognize a foreign divorce than one rendered in a sister State, the requirement of domicile has been extended to divorce decrees rendered by foreign tribunals. Thus, the rule has emerged that:

> Regardless of its validity in the nation awarding it, the courts of this country will not generally recognize a judgment of divorce rendered by the courts of a foreign nation as valid to terminate the existence of the marriage unless, by the standards of the jurisdiction in which recognition is sought, at least one of the spouses was a good faith domiciliary in the foreign nation at the time the decree was rendered. [13 A.L.R. 3d 1419, 1425 (1967).]

See also A. Ehrenzweig, Conflict of Laws, sec. 73, p. 247 (1962), and cases cited therein; 24 Am. Jur. 2d, sec. 965, p. 1101 (1966),

---

"a decree of divorce granted in one country by a court having jurisdiction to do so will be given full force and effect in another country by comity * * * . The principle of comity, however, has several important exceptions and qualifications. A decree of divorce will not be recognized by comity where it was obtained by a procedure which denies due process of the law in the real sense of the term, or was obtained by fraud, or where the divorce offends the public policy of the state in which recognition is sought, or where the foreign court lacked jurisdiction. [*Wolff v. Wolff,* 40 Md. App. 168, 389 A.2d 413, 418–419 (1978). Citations omitted.]"

and cases cited therein; Comment, "Mexican Divorce-A Survey," 33 Fordham L. Rev. 449 (1965).[10]

There is no question that throughout the foreign divorce proceedings, the Boyters resided and were domiciled in Maryland. Indeed, the divorce decrees of both foreign countries state this fact. And although the precise issue of the recognition of a divorce obtained in a foreign country in which both parties participate has not come before the Maryland courts, we believe that, if faced with the question, Maryland's highest court would follow the rule that domicile of one of the parties is necessary in order for a judgment of divorce by a foreign tribunal to be recognized as valid under principles of comity.

Petitioners argue that respondent should not be allowed to attack the validity of the foreign divorces in the Tax Court because such an attack is proper only where there are conflicting judicial decrees regarding the taxpayers' marital status. We do not share this view. Congress chose to enact separate rate schedules the application of which is entirely dependent upon whether the taxpayer is single or married. Clearly, in enforcing these provisions, the respondent has not only the right, but the duty, to determine the marital status of the taxpayer, and we have so held. *Gersten v. Commissioner*, 28 T.C. 756 (1957), affd. 267 F.2d 195 (9th Cir. 1959); *Eccles v. Commissioner*, 19 T.C. 1049 (1953), affd. per curiam 208 F.2d 796 (4th Cir. 1953).[11]

---

[10]For recent State court decisions following the rule that domicile of at least one of the parties is required before a foreign divorce decree will be recognized as valid, see, e.g., *Weber v. Weber*, 200 Neb. 659, 265 N.W.2d 436 (1978); *In re Estate of Atherley*, 44 Cal. App. 3d 758, 119 Cal. Rptr. 41 (1975); *Estate of Steffke v. Wisconsin Department of Revenue*, 65 Wis. 2d 199, 222 N.W. 2d 628 (1974); *Lorenzo v. Lorenzo*, 85 N.M. 305, 512 P.2d 65 (1973); *Litvaitis v. Litvaitis*, 162 Conn. 540, 295 A.2d 519 (1972); *Schacht v. Schacht*, 435 S.W.2d 197 (Tex. Civ. App. 1968); *Kittel v. Kittel*, 194 So. 2d 640 (Fla. Dist. Ct. App. 1967); *Clark v. Clark*, 192 So. 2d 594 (La. Ct. App. 1966); *Warrender v. Warrender*, 79 N.J. Super. 114, 190 A.2d 684 (1963), affd. per curiam 42 N.J. 287, 200 A.2d 123 (1964).

[11]We recognize that respondent is on record as generally following the policy petitioner supports. See G.C.M. 25250, 1947–2 C.B. 32; Rev. Rul. 67–442, 1967–2 C.B. 65; and Rev. Rul. 76–255, 1976–2 C.B. 40. Nevertheless, respondent is not debarred from self-correction. *Dixon v. United States*, 381 U.S. 68 (1965), *Lee v. Commissioner*, 64 T.C. 552 (1975), affd. 550 F.2d 1201 (9th Cir. 1977). In *Lee*, we considered essentially the same argument petitioner here advances. 64 T.C. at 554–556. Finally, in *Gersten v. Commissioner*, 28 T.C. 756 (1957), affd. 267 F.2d 195 (9th Cir. 1959), we held that under California law, a Mexican divorce decree would not be recognized even though in that case, like the one before us now, the specific divorce decree stood unimpeached in the California courts. Any other approach would require recognition of mail-order divorces for Federal tax purposes, as long as they were unchallenged, although they are clearly invalid in every State in the union. We would then have a Federal tax law of

In addition, petitioners err in their reliance on *Brewster v. Brewster*, 204 Md. 501, 105 A.2d 232 (1954), for the proposition that under Maryland law, a decree of divorce must be considered valid until its invalidity is declared by a court of competent jurisdiction—presumably a Maryland court. *Brewster v. Brewster, supra,* dealt with the issue of the power of a Maryland court to decree alimony in the wife's suit for a partial divorce when prior to that time, the husband obtained a decree of final divorce from a sister State, Arkansas. The court held that the Arkansas decree, regular on its face, must be presumed valid and given full faith and credit until a court could adjudicate the wife's contention that the husband had not acquired domicile in Arkansas, thus showing that the Arkansas court did not have jurisdiction to grant a divorce.

In the case before us, we are not dealing with the full faith and credit clause of the Constitution. More importantly, however, it is undisputed in our case that at all times throughout the foreign divorce proceedings the Boyters resided and were domiciled in Maryland. As opposed to the Arkansas decree in *Brewster,* which necessarily contained a finding that the husband had acquired domicile in Arkansas, the Haitian and Dominican decrees openly recite the fact that the Boyters resided and were domiciled in Maryland. Thus by simply taking the decrees at face value, it is apparent that the jurisdictional prerequisite to a valid divorce proceeding which will be recognized under principles of comity is lacking.[12]

It is true that one State, New York, has qualified the rule by extending recognition to a Mexican divorce proceeding where both spouses participated before the foreign tribunal, one by personal appearance and the other by appearing through an attorney, and where "residence" was acquired by one party through the statutory formality of signing a municipal register. *Rosenstiel v. Rosenstiel,* 16 N.Y.2d 64, 262 N.Y.S.2d 86, 209 N.E.2d 709 (1965). In *Rosenstiel,* the New York Court of Appeals employed an independent theoretical framework in recognizing a foreign bilateral divorce, whereby marriage was viewed as a

---

marriage, with some individuals married only under the Federal tax law and for no other purpose, although we rejected this invitation to havoc in *Lee v. Commissioner, supra.*

[12]Indeed, because the decrees explicitly find that the Boyters resided and were domiciled in Maryland, they would not be subject to recognition under the full faith and credit clause even if they had been rendered by a sister State. *Williams v. North Carolina,* 325 U.S. 226 (1945).

two-party contract and its dissolution analogized to an in personam civil action. See *Rosenstiel v. Rosenstiel*, 209 N.E.2d at 711, 712, and "Mexican Bilateral Divorce—A Catalyst in Divorce Jurisdiction Theory?", 61 Nw. U.L. Rev. 584, 601 (1966). However, New York stands alone in its view.[13] The prevailing analysis which forms the basis of the domicile theory and is adopted by the Maryland courts is that marriage is a status in which the State, a third party to the contract, has an interest. See *Pelle v. Pelle*, 229 Md. 160, 182 A.2d 37 (1962); *Slansky v. State*, 192 Md. 94, 63 A.2d 599 (1949); *Lickle v. Boone*, 187 Md. 579, 51 A.2d 162 (1947).

All other State courts which have faced the question of a foreign divorce where both parties participate in the divorce proceedings but neither obtains domicile there have followed the view that such a divorce is invalid. *Weber v. Weber*, 200 Neb. 659, 265 N.W.2d 436 (1978); *Everett v. Everett*, 345 So. 2d 586 (La. Ct. App. 1977); *Kugler v. Haitian Tours, Inc.*, 120 N.J. Super. 260, 293 A.2d 706 (1972); *Estate of Steffke v. Wisconsin Department of Revenue*, 65 Wis. 2d 199, 222 N.W.2d 628 (1974); *Commonwealth v. Doughty*, 187 Pa. Super. 499, 144 A.2d 521 (1958); *Bobala v. Bobala*, 68 Ohio App. 63, 33 N.E.2d 845 (1940); *Golden v. Golden*, 41 N.M. 356, 68 P.2d 928 (1937). In addition, this rule prevails in six States—California, Nebraska, New Hampshire, North Dakota, South Carolina, and Wisconsin[14] —by virtue of the enactment

---

[13]New York's solitary stand on this issue has been soundly criticized, and is thought by some to be the court's reaction to what it considered poor legislative judgment in only permitting a single ground for divorce (adultery) at the time *Rosenstiel v. Rosenstiel*, 16 N.Y.2d 64, 262 N.Y.S.2d 86, 209 N.E.2d 709 (1965), was decided. See, e.g., B. Currie, "Suitcase Divorce in the Conflict of Laws: *Simons, Rosenstiel and Borax*," 34 U. Chi. L. Rev. 26, 61 (1966); "Mexican Bilateral Divorce—A Catalyst in Divorce Jurisdiction Theory?", 61 Nw. U.L. Rev. 584, 607 (1966); H. Foster, "Recognition of Migratory Divorces: Rosenstiel v. Section 250," 43 N.Y.U. L. Rev. 429, 435 (1968). In 1965, the year *Rosenstiel* was decided, it was estimated that 250,000 New Yorkers had obtained Mexican divorces in an attempt to escape New York's restrictive divorce laws. H. Foster, "Recognition of Foreign Divorce Decrees," 32 U. Chi. L. Rev. 802, 804 (1965), citing the New York Times, Mar. 10, 1965, at 39M, col. 3. It is clear from the opinion that all of the judges were acutely aware of the effect of their holding for the thousands of people who had relied on Mexican divorces. The dissenters, although objecting vigorously to the majority's view with regard to the validity of the divorce, felt that a rule invalidating such divorces should be applied prospectively. We express no views on how the New York courts would view a foreign divorce obtained in the unusual circumstances involved in the instant case.

[14]Cal. Civ. Code sec. 5001 (West 1970); Neb. Rev. Stat. sec. 42–341 (1978); N.H. Rev. Stat. Ann. sec. 459:1 (1968); N.D. Cent. Code sec. 14–05–08.1 (1971); S.C. Code sec. 20–3–420 (1976); Wis. Stat. Ann. sec. 247.22 (West 1957).

by these legislatures of a provision of the Uniform Divorce Recognition Act, 9A U.L.A. 461 (Supp. 1965), which specifically denies recognition to a divorce decree obtained in another jurisdiction when both spouses were domiciled in the home State. That a foreign divorce when neither spouse obtained domicile will not be recognized by the true domiciliary State, is also the law in England. *Mountbatten v. Mountbatten,* 1 All Eng. Rep. 99 (1959).

We are therefore convinced that despite the participation in the divorce by both the Boyters, the courts of Maryland would not recognize it as valid to terminate the marriage. In this connection it is critical to distinguish between the underlying validity of a divorce, recognizable under principles of comity, and the principles of equitable estoppel. When circumstances exist that make it unfair to let individuals who participated in a divorce challenge its validity, the courts apply equitable estoppel to preclude them from doing so. But the issue here is the validity of the foreign decree under Maryland law and not whether the petitioners, themselves, may be estopped from attacking those decrees. Estoppel "is not a function of the decree but a personal disability of the party attacking the decree." H. Clark, Law of Domestic Relations 297 (West 1968). Even where foreign migratory divorces are expressly viewed as invalid, the State may recognize the defense of equitable estoppel to preclude the spouses, themselves, from later attacking the divorce decree's validity where they had participated in the divorce proceedings. See, e.g., *Weinberg v. Todd Shipyards,* 97 N.J. Super. 289, 235 A.2d 42 (1967); *Brown v. Brown,* 274 Cal. App. 2d 178, 82 Cal. Rptr. 238 (1969); 1 Restatement, Conflict of Laws 2d, sec. 74 (1971). Indeed, the doctrine has been applied to mail-order divorces that no State would recognize as valid; to divorces that have been judicially declared invalid; to divorces invalid under the Uniform Divorce Recognition Act adopted in the State; and even to instances where there was no judicial divorce at all. See H. Clark, *supra* at 294, 306–307. It is clear, then, that any disabilities that might be imposed on the petitioners, themselves, by estoppel (assuming that the doctrine would even be applied to the unusual facts before us) do not mean that the "decrees" in

these instances are valid under State law.[15]

Petitioners, at all times, remained residents and domiciliaries of Maryland. Because State law is determinative on the issue of marital status and because Maryland would not recognize the foreign divorces as valid to terminate the marriage, petitioners are not entitled to file their tax returns as single persons for the years 1975 and 1976.

*Decisions will be entered for the respondent.*

---

[15]Res judicata, sometimes unfortunately confused with estoppel, is a function of the decree rather than a personal disability and rests on quite different policies, particularly when applied to accord full faith and credit to sister State judgments. If domicile was or could have been litigated in a prior divorce action in a sister State, the doctrine is invoked under the full faith and credit clause to preclude subsequent collateral attack on jurisdictional grounds in any other State. See *Sherrer v. Sherrer,* 334 U.S. 343 (1948); *Johnson v. Muelberger,* 340 U.S. 581 (1951). The rationale of *Sherrer* and *Johnson* is here inapplicable, for not only are we concerned with foreign decrees, but the decrees would not be subject to full faith and credit even if rendered by a sister State as they expressly find that the petitioners were domiciled in Maryland.