FRED G. MEYER and BESSIE MEYER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Meyer v. Commissioner
Docket No. 1286-74.
United States Tax Court
T.C. Memo 1975-349; 1975 Tax Ct. Memo LEXIS 23; 34 T.C.M. (CCH) 1525; T.C.M. (RIA) 750349; December 8, 1975, Filed Theodore W. Glocker, Jr., for the petitioners. Donald W. Williamson, Jr., for the respondent. TIETJENS
MEMORANDUM OPINION TIETJENS, Judge: The *24 Commissioner determined a deficiency in petitioners' Federal income tax for the taxable years 1970 and 1971 in the amounts of $25,861 and $973 respectively. The issues remaining for determination are (1) whether the uncollectible portion of a judgment obtained by petitioners against a broker in a suit for recision is a loss under section 165(c)(2), I.R.C. 1954, [1] or a nonbusiness bad debt under section 166(d), and (2) whether the legal fees incurred during the suit should be treated as a capital expenditure or should be allowed as a deductible expense. This case was fully stipulated pursuant to Rule 122, Tax Court Rules of Practice and Procedure. The facts which we deem necessary for decision will be referred to below. Fred G. Meyer and Bessie Meyer, husband and wife, resided in Monticello, Florida, at the time they filed their petition herein. For the taxable years 1970 and 1971, they filed their joint income tax returns with the Southeast Service Center at Chamblee, Georgia. Petitioners over a period of 6-1/2 months from late 1968 through mid-1969 entered five different purchase *25 orders for stock from Dempsey-Tegeler & Co., Inc., a member of the New York Stock Exchange. The orders specified immediate delivery of the stock. Their advances for the full price of the stock and commissions equaled $38,000.84. After 9 months of asking for and impatiently waiting for the brokerage firm to deliver the stock, petitioners instituted a suit on February 16, 1970, to rescind the purchase orders and obtain return of their advances. After petitioners brought suit the brokerage firm attempted to deliver some but not all of the stock. Petitioners, however, refused to accept it. The United States District Court, Northern District of Florida, Tallahassee Division, on August 11, 1970, awarded petitioners summary judgment equaling the amount of their advances plus interest of $3,600.80. At the time of the suit the market value of the stock was substantially less than the amount that petitioners had paid. Realizing that the brokerage firm faced bankruptcy, petitioners on October 1, 1970, accepted $34,225 (cash of $28,500 and stock valued at $5,725) in full satisfaction of their judgment. They recovered $7,376.64 less than the court awarded judgment or $3,775.84 less than that *26 which they had deposited with the broker. Petitioners expended $8,612.83 in legal fees in obtaining the judgment and compromise settlement. On their 1970 return petitioners claimed a miscellaneous deduction of $15,989 for "loss of cash advanced to broker and related legal fees" which amount consisted of the $7,376.64 difference between their judgment ($41,601.64) and the amount they received upon settlement ($34,225) plus the legal fees of $8,612.83. The Commissioner determined that petitioners' deduction relating to their suit for recision of the stock purchase should not be allowed because (1) $3,600.80 of the amount claimed represented interest due them which they had never reported as income, (2) $3,776 claimed was deductible only as a nonbusiness bad debt under section 166(d) because it represented the uncollectible portion of the judgment obtained by petitioners against the broker, (3) $1,440.71 represented legal fees which should be allocated to stock received by petitioners upon settlement of their claim against the broker, and (4) $7,172 was a capital expenditure because it represented attorney's fees allocable to cash recovered by petitioners upon settlement of their *27 judgment against the broker. Petitioners in their reply brief conceded that the unrecovered interest was not a proper deduction. Petitioners included as part of their loss deduction the difference between the amount they deposited with the broker and the amount they accepted in settlement of the judgment. The Commissioner concedes in his reply brief that this particular portion of petitioners' claimed loss falls within the literal language of section 165(c)(2), which allows a deduction for "losses incurred in any transaction entered into for profit, though not connected with a trade or business." However, the Commissioner also asserts that the loss falls within the literal language of section 166(d) which governs nonbusiness bad debts and that, therefore, according to Putnam v. Commissioner,352 U.S. 82 (1956), the amount must be treated as a nonbusiness bad debt. [2]
The Commissioner, however, defines the relationship created at the time of the advances as one of principal and agent with *28 Dempsey-Tegeler being under an obligation to act as a finduciary. He further asserts that Dempsey-Tegeler breached its fiduciary duty by failing to deliver the stock and that this gave rise to a debtor-creditor relationship. The Commissioner relies on Iowa Southern Utilities Co. v. United States,348 F.2d 492 (Ct. Cl. 1965) and Rev. Rul. 69-458, 1969-2 C.B. 33, for his analysis. In Iowa Southern the corporate taxpayer claimed a bad debt deduction following a stockholder's derivative suit in state court. The state court proceeding determined that former officers of the corporation had fraudulently inflated the value of property sold by them to the corporation. The corporation was not able to recover the entire overcharge and claimed the difference as a bad debt. The Government argued that the difference should be treated as a loss since the actions of the officers resembled embezzlement. Designating the unrecovered sum a loss would have denied the taxpayers a deduction. The Court of Claims, relying on the definition of debt as a "valid and enforceable obligation to pay a fixed or determinable sum of money" (sec. 1.166-1(c), Income Tax Regs.), found *29 that such an obligation had existed between the officers and the corporation prior to the state court proceeding. They based this determination on the grounds that a debtorcreditor relationship can arise at law as well as by contract where one is liable or bound to pay an amount of money. The Court of Claims determined that the fiduciary role assumed by officers of a corporation imposed upon these officers "a clear and unqualified obligation to repay their fraudulent profits" and that this obligation created the debtor-creditor relationship necessary for a deduction under section 166. Iowa Southern,348 F.2d at 497. The Commissioner here, by reminding us that the stockbroker was the petitioners' agent hopes to attach the label "debt." He asserts that this label should attach upon the failure of the stockbroker to deliver the stock. In Iowa Southern the officers took advantage of their fiduciary role for private gain and the court found that this abuse of their responsibilities created an obligation to repay what they had fraudulently taken. This obligation the court called a debt. In our case the state court made no finding of fraudulent or misleading conduct. *30 It merely found that the stockbroker had breached its obligation to deliver under the contract. Upon breach the petitioners had two choices: to seek delivery of the stock or return of their purchase price. These choices were available to petitioners not because they were the broker's creditors, but because they had entered into a contract which the broker had breached. We do not find that these remedial choices available to the petitioners created a "debt" arising at law. We are also convinced that the rationale behind congressional passage of the nonbusiness bad debt provision indicates that the relationship between the petitioners and the stockbroker was not one of a debtor and creditor within the meaning of that section. Congress in passing section 166(d) recognized that there had been considerable abuse of the liberal allowance for nonbusiness bad debts "through taxpayers making loans which they do not expect to be repaid." [3] (Emphasis supplied). Therefore, the purpose of short-term capital loss treatment was "to put nonbusiness investments in the formofloans on a footing with other nonbusiness investments." (Emphasis supplied). Putnam v. Commissioner,352 U.S. at 92. *31 We do not think the transaction between the petitioners and the stockbroker should be called a loan nor can we agree that the stockbroker's obligation to the petitioners falls within the congressional intent of section 166(d). In Samuel Towers,24 T.C. 199 (Issue 3, p. 219) (1955), not appealed on this issue, 247 F.2d 233 (2d Cir. 1957), the taxpayers paid a corporation with which they were associated for completed lawnmowers in order to resell them. As a consequence of involuntary bankruptcy proceedings the corporation failed to deliver the finished lawnmowers. We held that the transaction was one entered into for profit and considered whether the loss should be treated as a loss within the meaning of section 23(e)(2), I.R.C. 1939, or a bad debt within the meaning of section 23(k), I.R.C. 1939. Relying on Lewellyn v. Elec. Reduction Co.,275 U.S. 243 (1927), we held that the loss was deductible in full. The Supreme Court in Elec. Reduction Co., on considering an issue arising out of prepayment for merchandise followed by a failure to deliver, said in part (275 U.S. at 246) though not decisive of the case: The buyer's *32 rights were upon a contract for the delivery of merchandise and were not a "debt" in either a technical or a colloquial sense. We conclude that if respondent's contract rights became worthless in 1918 he was not required to deduct his loss as a worthless debt * * * but was entitled to deduct it * * * as a loss sustained in that year. We recognize, of course, that the stocks in this case were not merchandise, in the usual sense of the word, but fail to see why that should make a difference. The Commissioner argues alternatively that if petitioners had received the stock any loss incurred would have been a capital loss and that, therefore, petitioners should not be able to change the result to an ordinary loss following a suit for recision. This argument fails to take into account the fact that petitioners, despite their persistent requests, were not tendered any of the stock until after suit was brought. The District Court found that the contract had been breached at that point and that recision was the most appropriate remedy. The suit did not change the loss from capital to ordinary because there were no capital assets *33 prior to suit upon which the petitioners would have taken a capital loss. At no time prior to suit were petitioners in possession of the stock nor as their actions show were they capable of acquiring the stock. The suit merely determined the obligation of the broker, it did not change the nature of the loss. Petitioners contend that they are entitled to deduct $8,612.83, the amount of legal expenses incurred in obtaining the recision and settlement with Dempsey-Tegeler, as a loss incurred in a transaction entered into for profit pursuant to section 165(c)(2). We have already determined that petitioners' payments to the stockbroker are the profit seeking activities contemplated by the statute and accordingly, we conclude that the legal expenses incurred by petitioners in order to obtain a recision of the contract are deductible under section 165(c)(2). See Robert E. Imel,61 T.C. 318, 327 (1973), in which we held that legal fees incurred by the taxpayer in order to obtain a release from his liability as a guarantor (a transaction which we concluded was entered into for profit) were deductible under section 165(c)(2). In Peter Stamos,22 T.C. 885, 891 (1954), *34 another guaranty case, we pointed out that the legal expenses were paid for the sole purpose of reducing the taxpayer's liability. In that case we held the guaranty was a transaction entered into for profit and thus the legal fees incurred for the purpose of diminishing liability were also deductible under the same section. Cf. Woodward v. Commissioner,397 U.S. 572 (1970) and United States v. Gilmore,372 U.S. 39 (1963), in which the Supreme Court looked at the origin and character of the claims. In our case the petitioners attempted to purchase stock and then incurred legal expenses in seeking to diminish the extent of their loss when the stock was not delivered. At the time they brought suit the stock had greatly decreased in value, and thus recision was much more satisfactory than ultimate receipt of the stock. The suit to rescind the contract, in effect, ended the transaction entered into for profit yet the suit and ensuing settlement are components of that transaction. They not only established the date at which gain or loss would be measured but they were pursued in order to make the best of what originally was a transaction for profit but *35 which ended up in a loss. The Commissioner, relying on Pennroad Corp.,21 T.C. 1087 (1954), affd. 228 F.2d 329 (3d Cir. 1955) and Helvering v. Stormfeltz,142 F.2d 982 (8th Cir. 1944), asserts that the suit was instigated for the purpose of recovering property and that, therefore, the expenses incurred are capital expenditures and thus constitute a part of the basis of the property and are not deductible expenses. The purpose of the expenditure for legal fees was to rescind a contract for stock and to recover the purchase price. It did not concern title to a capital asset. The judge in the District Court granted summary judgment on the grounds that Dempsey-Tegeler breached the stock purchase contract and that recision was the appropriate remedy. Petitioners did not prevail over Dempsey-Tegeler for misappropriating their funds or misusing their assets. Following Dempsey-Tegeler's failure to deliver and the stock's dramatic drop in price, petitioners sought return of their purchase price rather than delivery of the stock as the best way to deal with a transaction that was not going to make them a profit. However, we are in agreement *36 with the Commissioner that a portion of the legal fees should be allocated to the stock received by petitioners upon settlement of their claim against Dempsey-Tegeler and added to the basis of that stock. The portion of the legal fees attributable to the recovery of stock is a nondeductible capital expenditure which will be added to the basis of the stock, because the underlying purpose of petitioners' suit was to recover their cash advances, and they compromised by accepting a portion of those advances in stock. The legal fees allocated to the stock's basis should be equal to the percentage that the stock's value made up of the total recovery. Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 unless otherwise stated.↩
2. The Court in Putnam↩ at p. 88 states, "a loss attributable to the worthlessness of a debt shall be regarded as a bad debt loss, deductible as such or not at all."
3. H. Rept. No. 2333, 77th Cong., 2d Sess. 45 (1942).↩