JACK WOLFSON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
WOLFSON v. COMMISSIONER
Docket No. 9132-78
United States Tax Court
T.C. Memo 1982-698; 1982 Tax Ct. Memo LEXIS 63; 45 T.C.M. (CCH) 244; T.C.M. (RIA) 82698; November 29, 1982. *63 Petitioner transferred a diamond engagement ring and a ring guard to G, a woman he was dating. About a week later G decided to terminate their relationship. Petitioner sued for the cost of the diamond engagement ring and the ring guard and was awarded a default judgment for the full amount in 1976. This judgment created an enforceable obligation on G to pay petitioner this amount. In 1977, petitioner obtained execution of this judgment, but it was returned nulla bona.
Held: Petitioner has failed to prove that his debt became worthless in 1976, and so no deduction is allowable for 1976. Sec. 166(d)(1), I.R.C. 1954. Samuel R. Miller, for the petitioner. Thomas G. Potts, for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined a deficiency in Federal individual income tax against petitioner for 1976 in the amount of $408. After a concession by petitioner as to one of the two adjustments in the notice of deficiency, the issues for decision are: (1) Whether there was a debt (within the meaning of sec. 166) [1] to petitioner from a woman on account of petitioner's transfer [2] of a ring and ring guard to her and his obtaining a default *64 money judgment against her on account of her refusal to return the ring and ring guard; and (2) If a debt arose, whether the debt became worthless during 1976. FINDINGS OF FACT Some of the facts have been stipulated; the stipulation and the stipulated exhibits are incorporated herein by this reference. When the petition in this case was filed, petitioner resided in Dallas, Texas. Petitioner was a salesman. Houston was in his sales territory, and in 1973 and 1974, he visited there about every 45 days for two or three days at a time. On one of these trips, perhaps in early 1973, he met Yvonne Gibbs (hereinafter sometimes referred to as "Gibbs"). At some point in 1973 or 1974, petitioner began dating Gibbs. In late 1974, petitioner transferred to Gibbs a wolf's head ring (hereinafter referred to as "the wolf's head ring") *65 which had diamonds in its eyes and mouth, totalling almost two carats in weight. Petitioner and Gibbs understood that Gibbs would not date anyone else. The next day, petitioner and Gibbs drove together to Dallas and she visited him for a weekend or a week. In 1974 around Christmas time, Gibbs invited petitioner to her parents' house in Houston for Christmas dinner. He went and was introduced to her parents. On another occasion Gibbs flew to Dallas to visit petitioner for a weekend or a week. Petitioner reimbursed her for the cost of the flight. Gibbs also understood that he would reimburse her for the cost of keeping her poodle in a kennel during both visits, but he did not reimburse her. Gibbs' dog stayed at the kennel for perhaps as long as two months. This stay resulted in a kennel bill of about $400. On January 20, 1975, petitioner purchased a 14K white gold, six-prong set Tiffany 74/100 carat diamond engagement ring for $810 and a "dome" style ring guard for $240 at a jewelry store in Cincinnati, Ohio. (These items are hereinafter sometimes referred to as "the diamond engagement ring" and "the ring guard", respectively.) About a week later, around Gibbs' birthday, petitioner *66 drove to Houston, where he transferred the diamond engagement ring and the ring guard to Gibbs and took back the wolf's head ring. Gibbs considered petitioner and herself to be "engaged", but did not understand that a marriage date was set. About a week after this, Gibbs decided not to see petitioner anymore. He tried repeatedly to telephone her, but she would not speak with him. Because petitioner did not give Gibbs money for the kennel bill, she sold the diamond engagement ring and the ring guard separately to pay this bill in February or March of 1975. Sometime around the spring of 1975, petitioner visited Gibbs' parents' house, and asked her mother to talk to Gibbs so that he could get the diamond engagement ring or the ring guard back. Gibbs' mother telephoned Gibbs and allowed petitioner to speak with Gibbs. Petitioner asked Gibbs to return the diamond engagement ring, but she refused to do so. At that point Gibbs was living in Houston, but in a different house than the one she lived in on petitioner's prior visit when he transferred the diamond engagement ring and the ring guard to her. Gibbs did not have a listed telephone number. On March 20, 1975, petitioner's attorney *67 (not his counsel in the instant case) sent a letter to Gibbs, demanding that she return "the engagement ring" or "the equivalent value thereof," and threatening to sue if she failed to company. Petitioner filed a petition in the County Civil Court of Law, Harris County (Houston), Texas (hereinafter referred to as "the Harris County Court"). The petition asked for judgment against Gibbs in the amount of $1,050, plus interest, alleging that (1) on or about January 28, 1975, the diamond engagement ring was delivered to Gibbs "in contemplation of said marriage", and (2) without any fault on petitioner's part, on or about April 10, 1975, she advised him that she would not marry him nor would she return the diamond engagement ring. Petitioner did not have Gibbs' address at that time and could not find her. The summons relating to the petition was delivered to Gibbs' parents' house and left in their yard after her mother told the person who brought it that her daughter did not live there. Gibbs had actual knowledge of the service of the summons and of the filing of petitioner's suit against her. On February 4, 1976, the Harris County Court rendered a default judgment against Gibbs for *68 $1,050, plus interest. Once the default judgment became final, it created an enforceable obligation on Gibbs' part to pay to petitioner a fixed or determinable sum of money in the amount of $1,050. Execution of the judgment was obtained about the middle of 1977, and was returned nulla bona (i.e., no assets of Gibbs were found which could be levied on). On his 1976 Federal income tax return, petitioner reported adjusted gross income of $11,518. Respondent disallowed $753 of claimed "above-the-line" deductions for employee business expenses, in effect increasing petitioner's adjusted gross income to $12,271. On his tax return, petitioner claimed itemized deductions of $2,629, including a theft loss deduction for the diamond engagement ring and the ring guard in the amount of $950 ($1,050 loss, minus $100 "floor"). Respondent disallowed this deduction, in effect reducing petitioner's itemized deductions to $1,679. OPINION Petitioner contends that he is entitled to a nonbusiness bad debt deduction under section 166(d)(1) for 1976. [3] Respondent maintains that there was no bad debt under section 166(d)(1) and that, even if there were, the debt did not become worthless in 1976. [4] *69 Respondent warns us that a ruling for petitioner would "in essence, open the doors of litigation to allow every rejected lover to come into this Court, and ask the Court to allow him a deduction on his tax return." Respondent urges that the fisc not assume "part of the cost of the romance of this man, with Ms. Yvonne Gibbs." We agree with respondent that petitioner has failed to prove that the debt (if any) became worthless in 1976. [5] *70 Section 166(d)(1)[6] allows individuals to deduct worthless nonbusiness bad debts as short-term capital losses. Such a debt is deductible in the year in which it becomes wholly worthless. Bodzy v. Commissioner,321 F.2d 331, 335 (CA5 1963), revg. on another issue a Memorandum Opinion of this Court; [7]Crown v. Commissioner,77 T.C. 582, 598 (1981). This is a factual matter, as to which petitioner has the burden of proof, not only as to whether the debt became worthless at all but also as to whether it become worthless in a year in issue. Crown v. Commissioner,supra;Dallmeyer v. Commissioner,14 T.C. 1282, 1291 (1950). See Boehm v. Commissioner,326 U.S. 287, 293 (1945). It is generally accepted that the year of worthlessness is to be fixed by identifiable events which form the basis of reasonable grounds for abandoning any hope of recovery. Crown v. Commissioner,supra;James A. Messer Co. v. Commissioner,57 T.C. 848, 861 (1972); Dallmeyer v. Commissioner,14 T.C. at 1291-1292. See Boehm v. Commissioner,326 U.S. at 291-292. Thus, we search for identifiable events showing that the asserted debt from Gibbs to petitioner became worthless *71 in 1976. The record in the instant case includes little evidence bearing upon worthlessness in 1976. Petitioner testified as to his intermittent efforts to get in touch with Gibbs, but it is not clear that this testimony relates to 1976 rather than 1975. Petitioner is helped by Gibbs' testimony that in 1976 she did not have any property other than "personal clothing, jewelry, that sort of thing." However, the value of this testimony is diminished by Gibbs' vague testimony as to her earnings, how she was supporting herself, and what other jewelry *72 she had. The record in the instant case does not include any persuasive evidence regarding a 1976 identifiable event of worthlessness. The return of execution nulla bona did not occur until 1977. We need not determine if the debt became worthless in 1977. We conclude that petitioner has failed to prove that the debt became worthless in 1976. Petitioner relies on several cases for the proposition that if "a debtor disappears * * * [then] the debt may be deducted by the creditor in the year of the disappearance." We do not see in the record in the instant case any evidence fixing 1976 (rather than, say, 1975) as the year when Gibbs disappeared, if indeed she can fairly be said to have disappeared. Petitioner contends that the facts of his case are similar to those in Meurer Steel Barrel Co., Inc. v. Commissioner,7 B.T.A. 64 (1927). In Meurer, suit was brought on a note, judgment was obtained, and execution was returned nulla bona, all in 1920. The debtor was examined in 1920 and testified that he had no property on which execution could be levied.Thereupon, in 1920, the creditor charged off the debt on its books. We held that "Under the facts and circumstances, it is our opinion *73 that the petitioner ascertained the debt in question to be worthless and charged it off during the taxable year involved [i.e., 1920]." 7 B.T.A. at 66. We conclude that Meurer does not help petitioner because (1) in Meurer the attempted execution and return nulla bona marked the year of worthlessness while in the instant case these identifiable events did not occur until 1977 and petitioner claims that 1976 is the year of worthlessness, and (2) our holding in Meurer reflects the subjective worthlessness test (see description in James A. Messer Co. v. Commissioner,57 T.C. at 861 n.3) with the charging off of the debt as another important 1920 identifiable event while in the instant case the test is objective worthlessness and petitioner has not presented us with a persuasive 1976 identifiable event. Petitioner relies on our opinion in Sherman v. Commissioner,18 T.C. 746 (1952), for his contention that "Where a debtor is clearly unable to pay, the absence of a formal demand for payment is no bar [to a bad debt deduction] if such a demand would have been a 'useless act.'" We agree with this proposition. However, in Sherman we concluded that the debtor was clearly unable to pay because, *74 we found, the debtor was insolvent. In the instant case, we have no basis for making such a finding of insolvency and, indeed, petitioner requests no such finding. The citation of Sherman does not advance petitioner's cause. We hold for respondent that petitioner has failed to carry his burden of proving the year of worthlessness. [8] *75 In order to allow petitioner the full benefit of the percentage standard deduction for 1976 (sec. 141(b)), Decision will be entered under Rule 155.
Footnotes
1. Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the year in issue. ↩
2. We use "transfer" herein to refer to the transactions between petitioner and the woman as to two rings and a ring guard because one of the issues raised is whether the transfers were gifts or were conditioned on marriage.↩
3. Petitioner concedes that he is not entitled to a theft loss deduction (sec. 165(c)(3)) as he had originally claimed. ↩
4. Respondent concedes that, if there was a debt which became worthless in 1976, then it results in a deduction of $1,000 for 1976, with $50 being carried over to 1977.↩
5. We do not decide whether some public policy requires this Court to close its doors to "every rejected lover." We leave for a more appropriate occasion (without suggesting whether there could be a more appropriate occasion) the determination of whether we should draw the requested distinction (for tax purposes only, of course) between activities that lead to marriage and activities that do not. See generally, Boyter v. Commissioner,74 T.C. 989 (1980), remanded 668 F.2d 1382 (CA4 1981); Turnipseed v. Commissioner,27 T.C. 758↩ (1957).
6. SEC. 166. BAD DEBTS. (d) Nonbusiness Debts. -- (1) General rule. -- In the case of a taxpayer other than a corporation -- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. [The subsequent amendments of this provision by paragraphs (1)(A) and (2) of section 1402(b) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1731, 1732, do not affect the instant case.] ↩
7. T.C. Memo. 1962-40↩.
8. Accordingly, we do not decide whether the transfers of what the parties stipulated to as a "diamond engagement ring" and a ring guard were merely birthday gifts, and whether (if the transfers were conditional on marriage) Gibbs' refusal to marry petitioner was justified so that Gibbs was entitled to keep the rings.We do not decide whether the respondent is foreclosed from making such arguments because of the parties' stipulation that "Once the aforesaid judgment [of the Harris County Court] became final, it created an enforceable obligation to pay a fixed or determinable sum of money in the amount of $1,050.00, as described in Reg. Sec. 1.166-1(c)." See Meyer v. Commissioner,547 F.2d 943 (CA5 1977), affg. T.C. Memo. 1975-349. In connection with this point, we do not rule on respondent's contention "that the Default Judgment is not binding on this court for the purposes of determining a federal tax liability as provided in Bosch v. Commissioner,387 U.S. 456↩ (1968) [sic]." Finally, we do not decide whether the amount of any such debt is to be reduced by the amount of the kennel bill Gibbs paid for her poodle's care in connection with her visits to petitioner.