JAMES E. JOHNSON AND SUSANNA E. JOHNSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Johnson v. Commissioner
Docket No. 26430-88
United States Tax Court
T.C. Memo 1991-346; 1991 Tax Ct. Memo LEXIS 396; 62 T.C.M. (CCH) 254; T.C.M. (RIA) 91346; July 29, 1991, Filed *396 Decision will be entered under Rule 155. James E. Johnson and Susanna E. Johnson, pro se. John A. Guarnieri, for the respondent. COLVIN, Judge. COLVIN
MEMORANDUM FINDINGS OF FACTS AND OPINION The primary issue for decision is whether petitioners are entitled to depreciation deductions and investment tax credits relating to a claimed $ 5 million purchase of Charolais cattle. As discussed below, we conclude they are not. Respondent determined the following deficiencies in income tax and additions to tax: Additions to Tax
Years
Deficiencies
Sec. 6653(a)(1)
Sec. 6653(a)(2)
1981
$ 412,705.36
$ 20,635.26
50 percent of
the interest
due on
$ 412,705.36
1982
379,068.00
18,953.40
50 percent of
the interest
due on $ 379,068
After concessions, the following issues remain: 1. Whether petitioners may deduct $ 512,096.52 in 1981 and $ 679,717.01 in 1982 for their farming and cattle activity, and whether they are entitled to investment credits of $ 618,648 in 1981 and $ 611,414 in 1982 for that activity. We are not convinced that the cattle transaction occurred as represented by petitioners, and thus we hold that they are *397 not entitled to the deductions and credits they claimed relating to it. 2. Whether petitioners are entitled to a $ 50,000 bad debt deduction in 1981 under section 166. We hold that they are not. 3. Whether petitioners were negligent in 1981 and 1982 under section 6653(a)(1) and (2). We hold that they were. All section references are to the Internal Revenue Code of 1954 as amended and in effect for 1981 and 1982. All Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT 1. Petitioners
Petitioners are husband and wife who resided in Toms River, New Jersey, when they filed their petition. References to petitioner in the singular are to James Johnson. Petitioners used the cash receipts and disbursements method of accounting from 1970 through 1988. In 1972 petitioner James Johnson had a net worth of $ 6 million. Susanna Johnson did not have any knowledge or experience in farming or raising cattle. Priscilla Oughton is petitioners' daughter. Petitioner maintained a checking account (#18-8129-9) in the name of "Priscilla Oughton, James Johnson Business Account" at the First National Bank of Toms River, New Jersey, from 1970 through *398 1988. Petitioner and Priscilla Oughton were signatories for the account; however, petitioner controlled all deposits and disbursements. Priscilla Oughton did not sign any checks drawn on the account from 1970 to the date of trial except for a few small checks to charitable organizations written with petitioner's permission. Petitioner wrote the following checks from the account payable to Priscilla Oughton: Date
Amount
December 21, 1981
$   700,000
September 23, 1982
1,200,000
December 19, 1983
1,000,000
December 9, 1984
1,000,000
December 13, 1985
1,000,000
Total
$ 4,900,000
Each of the checks was deposited by petitioner on the same day in the account from which it was written. Priscilla Oughton neither knew about nor had possession of the checks. 2. Rip Van Winkle Farms
Petitioner and Joseph Yelenscics, Sr., a businessman and banker, jointly purchased a farm in Florida in 1970 known as Rip Van Winkle Farm. Petitioner and Yelenscics later jointly purchased two more farms adjacent to Rip Van Winkle Farm known as Mar-K Farm and Wingfield Farm. All three were then collectively known as Rip Van Winkle Farms of Florida. Petitioner and Yelenscics purchased *399 cattle to stock the farms at about the time they purchased the farms. Petitioner and Yelenscics operated Rip Van Winkle Farms as a cattle ranch under an oral understanding that each had a one-half interest in the capital, profits, and losses of the operation. They filed U.S. partnership returns under the name Rip Van Winkle Farms of Florida. Johnson Lumber Company was a partnership owned and operated in 1970 through 1972 by both petitioners as equal general partners. The Rip Van Winkle Farms partnership returns list Johnson Lumber Company as a 50-percent general partner of Rip Van Winkle Farms. Petitioner Susanna Johnson was substituted for Johnson Lumber Company as a Rip Van Winkle Farms general partner from 1973 through 1988. However, petitioner exercised control over his wife's interest in the farms. Petitioner or Yelenscics, or both, made all decisions for the partnership. Petitioners' accountant, Everette H. Pfeiffer, prepared the Rip Van Winkle Farms partnership returns and amended returns from 1971 through 1988 based upon the cash receipts and disbursements method of accounting. Mr. Pfeiffer relied solely on unaudited information given to him. He did not attempt to *400 verify or otherwise test the accuracy of any of the representations or information given to him. Rip Van Winkle Farms moved some of the cattle from Florida to petitioners' ranches in Mississippi. Rip Van Winkle Farms sold its Florida farms in 1976. 3. The Johnson Farms
Johnson Farms was a group of three farms, Bomar, Fuller, and Priester, located in the Meridian, Mississippi area. Johnson Farms totaled about 4,000 acres. They were operated as cattle and timber farms. Petitioners' daughter, Priscilla Oughton, and her husband John Oughton held title to Johnson Farms from 1974 through 1988. However, neither Priscilla Oughton nor her husband controlled Johnson Farms. Neither of them had knowledge of cattle farming. Petitioner controlled the acquisition and disposition of Johnson Farms assets from 1974 to the date of trial. The daily operations were entrusted to Robert Johnson, petitioner's brother, and Robert Shelton, petitioner's brother-in-law. Johnson Farms operated as a cattle and timber ranch. Profits and losses were reported on partnership returns. Pfeiffer prepared Priscilla and John Oughton's income tax returns as well as the Johnson Farms partnership returns *401 from 1973 to the date of trial. Pfeiffer relied upon books and records maintained by petitioners to determine farm income and loss of the Oughtons and Johnson Farms. Pfeiffer did not attempt to verify the truth or otherwise test the accuracy of the information upon which he relied. Pfeiffer did not review any of the Oughton's income tax returns with them. Instead, he gave the completed returns to petitioners. 4. Honey Creek Ranch
In September 1973, petitioner and Yelenscics purchased about 4,000 acres of farmland in Delaware County, Oklahoma, known as Honey Creek Ranch. It included a 1,000 acre ranch known as Horseman Ranch. Petitioner Susanna Johnson and Yelenscics took title to these farms as tenants-in-common. They executed a written partnership agreement that lists the farm name as Honey Creek Ranch. Honey Creek Ranch operated as a commercial beef cattle ranch. It is not clear whether or how many cattle were purchased with the ranch. Some Honey Creek cattle came from the Mississippi Farms controlled by petitioner. Some of those cattle were originally from the Rip Van Winkle Farms in Florida. Honey Creek Ranch did not enter any of its cattle in contests or *402 production sales promoted by breeding associations, such as the American Charolais Association. The Rip Van Winkle Farms partnership obtained financing to operate Honey Creek Ranch from the Vinita Production Credit Association of Vinita, Oklahoma (Vinita PCA). The partnership first applied for a loan from Vinita PCA in 1975, and received several other loans until 1985. Petitioner Susanna Johnson executed a bill of sale purporting to transfer her title in the personal property of the Honey Creek Ranch to Yelenscics to help him obtain financing for ranch operations. Petitioner Susanna Johnson remained a silent partner in the Honey Creek Ranch and Rip Van Winkle Farms partnership after the bill of sale was executed. Vinita PCA held liens on all of the Honey Creek Ranch cattle from 1975 through 1985 to secure loans. To monitor its loans to Rip Van Winkle's Honey Creek Ranch, Vinita PCA occasionally conducted on-site inventories and prepared valuation reports concerning cattle and equipment on the ranch. Vinita PCA also monitored the ranch's operations. Honey Creek Ranch satisfied part of its obligations to Vinita PCA directly from proceeds of cattle sold during 1975 through 1985. *403 Weight or poundage primarily influenced the cattle prices that Honey Creek Ranch received during 1974 through 1987. The particular breeding history or pedigree of the animals sold did not influence those prices. Petitioner effectively controlled his wife's interest in the farms. Petitioner or Yelenscics, or both, made all decisions for the farms. Petitioners and Yelenscics reported profits and losses from the operation of Honey Creek Ranch under the same name and employer identification number as Rip Van Winkle Farms. The partnership returns filed by Rip Van Winkle Farms do not separately allocate income and expenses of the Florida and Oklahoma farms. From 1974 through 1976, some cattle on the Honey Creek Ranch contracted brucellosis, an infectious disease. The State of Oklahoma quarantined the ranch, and paid owners of the infected cattle $ 50 per head to slaughter infected animals. Owners of registered cattle that were infected received more than $ 50 per head. The Honey Creek Ranch was paid at the rate of $ 50 per head. 5. The Purported Charolais Cattle Herd
Cattle maintained by Rip Van Winkle Farms at its Florida ranch were shipped to Johnson Farms. Some of *404 these cattle were later shipped to Honey Creek Ranch. Honey Creek Ranch had about 1,200 to 1,500 cattle in May 1974. About 600 cattle were shipped by truck from Johnson Farms to Honey Creek Ranch from May 1974 through November 1975. These cattle were of many breeds. Most of the cattle were in poor condition. The cattle were shipped to Honey Creek Ranch because the Johnson Farms pasture land in Mississippi was not suitable to sustain the cattle. Petitioner James Johnson was not personally involved in the cattle shipment. Petitioners did not maintain any records of the number, identity, or breeds of the shipped cattle. Registration certificates were not issued to Rip Van Winkle Farms or Honey Creek Ranch by the American Charolais Association for any cattle delivered to Honey Creek Ranch beginning in spring 1974. In September 1975, Honey Creek Ranch maintained 1,900 cattle with a total value of $ 447,665. Honey Creek Ranch had its greatest number and value of cattle in October 1976 when it had 2,471 cattle worth $ 609,930. Rip Van Winkle Farms' books and records do not reflect the purchase of $ 5 million in cattle from Johnson Farms. Johnson Farms' books and records reflect *405 neither the sale of $ 5 million in cattle to Rip Van Winkle Farms, nor any amount due from the alleged sale. There was no written agreement for Rip Van Winkle Farms or Johnson Farms reflecting a $ 5 million cattle transaction. Petitioner did not tell his daughter Priscilla Oughton of a $ 5 million cattle transaction. No written agreement was ever prepared on behalf of petitioner Susanna Johnson, Johnson Farms, or Priscilla Oughton reflecting the purported sale of $ 5 million of Charolais heifers. The American Charolais Association did not issue registration certificates for any Charolais heifers to petitioners. Petitioners did not maintain any records reflecting the identities of any cattle which were the subject of the purported 1980 $ 5 million purchase of Charolais heifers from Johnson Farms. However, petitioners drafted a $ 4,900,000 promissory note to the order of Priscilla Oughton. The note required a balloon payment of $ 4,900,000 in 1990 with interest on the unpaid balance accruing each year until paid. Petitioners did not make any interest payments, irrespective of the terms of the note that required a written agreement to alter it. Petitioners did not deliver the *406 note to their daughter. Priscilla Oughton had no knowledge of the promissory note or any sale of $ 5 million in cattle by Johnson Farms to petitioner Susanna Johnson. While being audited by the Internal Revenue Service, petitioner Susanna Johnson filed a lawsuit on June 19, 1987, in Oklahoma State Court against Yelenscics for an accounting concerning 1,039 cattle that Yelenscics allegedly sold. The alleged 1974 sale of $ 5 million in cattle by Johnson Farms to Honey Creek Ranch, and the alleged 1980 $ 5 million sale of the Charolais heifers to petitioner Susanna Johnson were a part of the lawsuit. The case was removed to Federal District Court on or about July 20, 1987 (docket No. 87-572-B). Yelenscics died on September 14, 1987. The executor of his estate was substituted as the defendant in the action for accounting. The District Court entered judgment against petitioner Susanna Johnson on May 11, 1989. The judgment was affirmed in part and reversed in part by the Court of Appeals for the Seventh Circuit on June 28, 1990, after termination on the merits after oral hearing (Appeal No. 89-50-96). We conclude from the foregoing that Johnson Farms did not sell $ 5 million of *407 Charolais cattle to Rip Van Winkle Farms in 1974 or any of the years at issue. We also conclude that petitioner Susanna Johnson did not enter into an agreement in 1980 with Johnson Farms to purchase about 1,100 purebred Charolais heifers, Charolais cattle progeny for $ 5 million. 6. Meridian Production Credit Association of Meridian, Mississippi
Petitioner Susanna Johnson had loans due in 1981 and 1982 to the Meridian Production Credit Association of Meridian, Mississippi, and the Farmers Home Association. The loans were secured operating loans for petitioners' Mississippi farms. Respondent concedes that petitioners incurred and paid $ 38,036.48 of interest in 1981 and $ 55,136.25 in 1982 to the Meridian Production Credit Association, and $ 8,980.74 in 1982 to the Farmers Home Administration. 7. Fifty Thousand Dollar Loan to Nicholas Reisini
Petitioners took a $ 50,000 business bad debt deduction in 1981 for a purported loan to Nicholas Reisini. Reisini entered a guilty plea following his indictment for various Federal crimes involving fraud, making false statements to banks, and interstate transportation of stolen funds. He was sentenced to Federal prison. Petitioner *408 had various business dealings with Reisini before 1979. They were close friends during that time and up to Reisini's death. There is no documentary evidence of a $ 50,000 loan made by petitioners in currency in two installments in 1979 to Reisini. An involuntary bankruptcy petition was filed against Reisini on November 9, 1979. On that day, petitioner filled out a $ 50,000 check drawn on Reisini's bank account. Petitioner filled in the date of November 1, 1979, and the payee as himself or South East Mall. Petitioners did not file a proof of claim in Reisini's bankruptcy case. Petitioners were not in the trade or business of lending money. Petitioners' alleged loan to Reisini was not made in connection with petitioners' trade or business. 8. Income Tax Returns
Pfeiffer prepared petitioners' income tax returns from 1971 through 1988. He relied solely upon unaudited information that petitioners gave him. He did not attempt to verify or otherwise test the accuracy of the information provided to him by petitioners. Petitioner Susanna Johnson maintained a double entry set of books for herself, Priscilla Oughton, Rip Van Winkle Farms, Johnson Farms, and all other related *409 Johnson family entities from 1970 to the date of trial. Pfeiffer made many of the entries at year end. He allocated items of income and expense among the related entities as instructed by petitioners. Petitioners claimed Schedule F deductions from the operation of five cattle farms totaling about 1,500 acres in Lauderdale and Neshoba counties in Mississippi. These were different from Johnson Farms, which covered about 4,000 acres in the Meridian area. Meridian is in Lauderdale County. Petitioner Susanna Johnson held title to the five cattle farms. Petitioners reported profits and losses from the five farms on Schedule F of their income tax returns for 1979 through 1986. The operating results of petitioners' five Mississippi farms were combined with claimed expenses of petitioners' alleged $ 5 million Oklahoma cattle herd onto one Schedule F filed with their returns for 1980 through 1986. Petitioners treated the five Mississippi farms and the claimed $ 5 million Honey Creek Farms, Oklahoma cattle herd as a single integrated cattle or farming activity from 1980 through 1986. Their books and records did not segregate the operating results of the five Mississippi Farms or the *410 $ 5 million herd at Honey Creek Farms. Petitioners reported operating profits and losses from their farming activity, excluding extraordinary capital transactions, as follows: Schedule F
Schedule E
Oklahoma Cattle
Year
Rip Van Winkle
Mississippi Farms
1970
($    84,573.63)
1971
(138,738.09)
1972
45,962.61 1973
(146,831.46)
1974
(270,104.71)
1975
(301,997.00)
1976
(193,078.50)
1977
(105,615.04)
1978
(109,654.78)
($    28,917.00)
1979
(113,209.20)
(12,628.97)
1980
(183,538.76)
(537,623.89)
1981
42,106.65 (426,015.17)
1982
(61,759.95)
(655,053.09)
1983
(37,636.50)
(574,172.78)
1984
(498.50)
(683,719.00)
1985
(97,937.50)
(435,194.00)
1986
(34,161.00)
(514,028.00)
1987
(796.50)
(39,792.00)
1988
--
43,495.00 Total
(1,792,061.86)
($ 3,863,648.90)
Petitioners reported net gains and losses from extraordinary capital transactions of their farming activity as follows: Schedule F
Schedule E
Oklahoma Cattle
Year
Rip Van Winkle
Mississippi Farms
1970
1971
1972
($ 117,104.00)
1973
(3,343.50)
1974
1975
44,310.00 1976
255,507.00 1977
3,293.00 1978
12,774.00 1979
4,136.00 1980
379,250.00 1981
977.00 1982
1983
1984
1985
$  37,249.00 1986
(1,035,065.00)
1987
1,619,423.00 1988
Total
$ 579,799.50 $ 621,607.00 *411 Petitioners claimed the following deductions on Schedule F of their 1981 and 1982 income tax returns: Deductions
1981
1982
Cost of goods sold
$  10,000
$ 133,500
Rent
5,414
4,061
Repairs
10
Interest
98,727
110,137
Veterinary Fee
45
Gas, Fuel
68
Taxes
1,798
1,164
Loan Fees
1,154
923
Miscellaneous
713
Depreciation (Oklahoma Cows)
416,250
475,000
Depreciation (Other)
16,669
18,337
Totals
$ 550,135
$ 743,835
Petitioners did not report any income from the sale or breeding of cattle during 1980 through 1987. Petitioners claimed investment tax credit for 1981 and 1982 as follows: Year
Amount
Property
1981
$ 135,000 Oklahoma cows (Schedule F)
1,998 Equipment (Form K-1 Rip Van Winkle)
2,415 Equipment (nonfarm related)
479,235 Carryforward from prior years
$ 360,000   (Okla. cows from 1980)
21,500   (cows, Rip Van Winkle)
5,708   (equip, Rip Van Winkle)
2,000   (equip, Schedule F)
90,027   (equip, nonfarm)
$ 479,235
$ 618,648 Total available credit
(13,347)
Amount used in 1981
$ 605,301 Carryforward to 1982
1982
5,000 Oklahoma cows (Schedule F)
1,113 Equipment (Schedule F)
605,301 Carryforward from prior years
$ 611,414 Total available credit
(5,088)
Amount used in 1982
$ 606,326 Carryforward
*412 OPINION 1. Deductions Relating To Cattle Farming Activities
a. Claimed $ 5 Million Charolais Cattle Transaction
Petitioners claimed Schedule F depreciation deductions attributable to a $ 5 million investment in cattle. The amount of the depreciation expense deduction is $ 416,250 for 1981 and $ 475,000 for 1982. Petitioners claim that shortly after they purchased the Honey Creek Ranch in Oklahoma, petitioner on behalf of Johnson Farms, entered into an agreement in 1974 with Yelenscics on behalf of Rip Van Winkle Farms, to sell 200 Charolais cattle to Rip Van Winkle Farms at $ 5,000 per head for a total of $ 1 million. Petitioners contend that the 200 Charolais were shipped by truck to the Honey Creek Ranch in 1973. They also contend that $ 650,000 of the $ 1 million has not been paid. Petitioners also contend that in addition to the claimed $ 1 million Charolais sale, petitioner on behalf of Johnson Farms and Yelenscics on behalf of Rip Van Winkle Farms sold cattle to Rip Van Winkle Farms for $ 5 million. Petitioners contend that the $ 5 million was not payable until five years after the sale and that no interest was payable. Petitioners assert that about 1,900 *413 cattle were delivered to Honey Creek Ranch from Johnson Farms between spring of 1974 and spring of 1975 in satisfaction of the $ 5 million cattle deal. Petitioners contend that about 800 of these were common commercial beef cattle and the remaining 1,100 were purebred Charolais cattle. Petitioners contend that Yelenscics repudiated the $ 5 million cattle deal. Petitioners further contend that in 1980 petitioner Susanna Johnson and Rip Van Winkle Farms purchased for $ 5 million the progeny of the cattle delivered to Honey Creek Ranch in 1974 and 1975 (the 1980 $ 5 million Charolais sale). Petitioners contend that the purebred Charolais heifers purchased in the 1980 Charolais sale remained at Honey Creek Ranch after the 1980 purchase. Respondent argues that the 1980 $ 5 million Charolais sale was a sham and should not be recognized for Federal tax purposes. A taxpayer must have made a bona fide investment in the property for which depreciation is claimed. Estate of Franklin v. Commissioner, 544 F.2d 1045, 1049 (9th Cir. 1976), affg. 64 T.C. 752 (1975); Waddell v. Commissioner, 86 T.C. 848 (1986), affd. 841 F.2d 264 (9th Cir. 1988); *414 Mayerson v. Commissioner, 47 T.C. 340, 350 (1966). For Federal tax purposes, a sale has been generally defined as a transfer of property for money or a promise to pay money. Commissioner v. Brown, 380 U.S. 563, 570-571, 14 L. Ed. 2d 75, 85 S. Ct. 1162 (1965). Whether the purported 1980 $ 5 million Charolais cattle sale qualifies depends upon whether benefits and burdens of ownership were transferred to petitioners giving them a bona fide investment in the cattle for depreciation purposes. Cherin v. Commissioner, 89 T.C. 986 (1987); Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221 (1981). There is no written agreement of the purported 1980 $ 5 million Charolais sale. There is no documentary evidence that identifies the cattle or the number of cattle, or which allocates the $ 5 million purchase price. Petitioners gave no credible explanation why they never obtained registration certificates for their Charolais or any other cattle, or why they did not claim expenses for the care, feeding, and maintenance of a herd of Charolais cattle. Pfeiffer testified that the only expense he reported relating to the Oklahoma farm, i.e., *415 Honey Creek, was depreciation of $ 5 million of livestock. Although some cattle were delivered from Johnson Farms to Honey Creek Ranch in 1974 and 1975, it was to provide better pasture for the cattle. It appears that most of these cattle were already owned by Rip Van Winkle Farms and previously maintained in Florida. We conclude that the purported $ 5 million cattle transaction was a sham contrived by petitioner to obtain tax benefits. Petitioners executed a $ 4,900,000 note in favor of their daughter, Priscilla Oughton, who was a nominal general partner of the seller, Johnson Farms. Petitioners contend that the note was paid in full, and that the note is proof of the sale. We disagree. Petitioners never delivered the note to their daughter. She never knew of the note or the alleged 1980 $ 5 million Charolais sale. Although the note required a balloon payment in 10 years with interest accruing each year, petitioners unilaterally determined they would pay the note in 5 years without interest. Petitioners argue that they have proven that the note was paid. From 1981 through 1985, they wrote five checks totaling $ 4,900,000 payable to their daughter from the First National *416 Bank of the Toms River account. The checks were immediately redeposited into that account. Their daughter never possessed the checks or knew of their existence. Petitioner maintained control over the First National Bank of the Toms River account. We believe that petitioners' conduct was an attempt to make it appear that the 1980 $ 5 million Charolais sale occurred and had substance. 2. Investment Credit
Petitioners claimed investment tax credits of $ 618,648 on their 1981 returns and $ 611,414 for 1982. Respondent determined that petitioners were not entitled to the claimed credit on two grounds. First, respondent contends that the credit attributable to the $ 5 million Charolais herd in Oklahoma fails to qualify because the cattle activity did not exist, lacked economic substance or reality, and was not for profit. Second, respondent contends that the claimed investment credit attributable to Schedule F and non-Schedule F activities fails to qualify because petitioners failed to substantiate the activities. We agree with respondent on both theories. Section 38 allows a tax credit for investments in section 38 property. Section 38 property, as defined in section *417 48(a), is generally any personal property for which depreciation is allowable under sections 167 or 168. The credit is computed by applying the applicable percentage under section 46(a) and (b) against the basis of eligible property for the year the property is placed in service. Sec. 46(c); Hudson v. Commissioner, 77 T.C. 468, 471 (1981). The vast majority of petitioners' claimed available investment credit was related to the $ 5 million Charolais cattle in Oklahoma. The remainder of the claimed investment credit is for Rip Van Winkle Farms cows, Rip Van Winkle Farms equipment, and other farm and nonfarm equipment. We have found that the transactions involving the $ 5 million Oklahoma cattle herd was a factual sham. Accordingly, the cattle are not depreciable. Likewise, no investment credit is allowed with respect to the purported $ 5 million Charolais herd in Oklahoma. Waddell v. Commissioner, 86 T.C. 848 (1986), affd. 841 F.2d 264 (9th Cir. 1988); Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221 (1981). We have also found that petitioners failed to keep adequate books and records. Petitioners *418 have no records of the identification of the cattle, the date they were placed in service, the basis of the cattle, and the date the cattle were disposed of, or otherwise ceased to be section 38 property. Sec. 1.47-1(e)(1)(i), Income Tax Regs.; Crocker v. Commissioner, 92 T.C. 899 (1989); Gilman v. Commissioner, 72 T.C. 730 (1979); Briesacher v. Commissioner, T.C. Memo 1982-618. Petitioners' substantiation is woefully inadequate. Therefore, we sustain respondent's determination as to this issue. 3. Business Bad Debt Deduction Under Section 166
Petitioners claimed a business bad debt deduction of $ 50,000 for 1981 under section 166 for $ 50,000 in currency allegedly provided to Reisini, petitioner's good friend and former business partner. Respondent disallowed the deduction on grounds that: (1) The debt was not bona fide (funds were not advanced, and if advanced, repayment was not expected); and (2) the debt did not become worthless in 1981. Respondent's determination is presumed correct and petitioners bear the burden of proving otherwise. Rule 142(a). We agree with respondent on both grounds. Petitioners *419 must first prove that the debt in question is bona fide in that it arose from a debtor-creditor relationship based on a valid and enforceable obligation to pay a determinable sum of money. Adelson v. United States, 737 F.2d 1569, 1571 (Fed. Cir. 1984); Meyer v. Commissioner, 547 F.2d 943, 946 (5th Cir. 1977), affg. T.C. Memo 1975-349 (1975), and citing Iowa Southern Utilities Co. v. United States, 172 Ct. Cl. 21, 348 F.2d 492, 497 (1965); Continental Bankers Life Ins. Co. v. Commissioner, 93 T.C. 52, 66 (1989); Holderness v. Commissioner, T.C. Memo 1977-5, affd. per curiam 615 F.2d 401 (6th Cir. 1980); sec. 1.166-1(c), Income Tax Regs.
Petitioner contends that he lent $ 50,000 in currency to Reisini to make a profit. However, we are not persuaded that a loan transaction occurred as stated by petitioner. We are not persuaded that he lent $ 50,000 in currency to Reisini. There is no credible evidence corroborating petitioner's testimony on this point. Petitioners do not suggest that a note existed. Instead, they produced a blank check *420 for $ 50,000 drawn on Reisini's bank account. Petitioner admitted that he filed it in at the time of Reisini's bankruptcy in November 1979. The check does not show the purpose for which it was drawn. In addition to proving the bona fides of the debt, petitioners must prove that it became worthless in 1981, the year that they claimed the deduction. Estate of Mann v. United States, 731 F.2d 267, 275 (5th Cir. 1984). Petitioners have not shown if, when, or why the debt became worthless. In light of the foregoing, we hold that petitioners are not entitled to deduct $ 50,000 as a bad debt in 1981 under section 166. 4. Negligence Under Section 6653(a)
Respondent also determined that petitioners are liable for the additions to tax for negligence under section 6653(a)(1) and (2) for 1981 and 1982. Petitioners contend that their records were not negligently maintained or prepared. We agree with respondent. Section 6653(a)(1) imposes an addition to tax equal to five percent of the underpayment of tax if any part of the underpayment is due to negligence or intentional disregard of rules and regulations. Section 6653(a)(2) imposes an additional liability *421 of 50 percent of the interest due on the underpayment of tax attributable to negligence or intentional disregard of rules and regulations. Petitioners bear the burden of proving that respondent's determination that they were negligent or intentionally disregarded the rules and regulations for each of the years in issue was erroneous. Warrensburg Board & Paper Corp. v. Commissioner, 77 T.C. 1107, 1112 (1981); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972). For purposes of these sections, "Negligence is lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." Neely v. Commissioner, 85 T.C. 934, 947 (1985) (citing Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. in part and remanding in part 43 T.C. 168 (1964), and T.C. Memo 1964-299). Petitioners' failure to maintain adequate books and records to support their claimed deductions and credits constitutes negligence. Crocker v. Commissioner, supra at 917; Gilman v. Commissioner, supra at 751; *422 Briesacher v. Commissioner, supra. Petitioners were also negligent in that they claimed deductions and credits on their returns concerning the $ 5 million Oklahoma herd of cattle for which they had no bona fide investment. Accordingly, we sustain respondent's determination of additions to tax for negligence under section 6653(a)(1) and (2), as modified for concessions by respondent. To reflect the foregoing, Decision will be entered under Rule 155.